MARC E. JOHNSON, Judge.
|2Pefendant, Jeffery Nelson, appeals his convictions and sentences for second degree murder, felon in possession of a firearm, and conspiracy to commit obstruction of justice claiming insufficient evidence, erroneous denial of his challenges for cause during jury selection, erroneous admission of an officer’s testimony on expert matters, and denial of his right to present a defense. For the reasons that follow, we affirm Defendant’s convictions and sentences.
Defendant was indicted by a grand jury on February 2, 2012 and charged with the second degree murder of Charles Smith in violation of La. R.S. 14:30.1, felon in possession of a firearm in violation of La. R.S. 14:95.1, and conspiracy to commit obstruetion of justice in violation of La. R.S. 14:26 .and 14:130.1(A)(2) and/or (A)(3).[1] Defendant pled not guilty and proceeded to trial with his two co-defendants on August 5, 2013 before a twelve-person jury. After an eight-day Ltrial, the jury returned a verdict of guilty as charged against Defendant on all counts.[2]
The trial court subsequently sentenced Defendant to concurrent sentences of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence for second degree murder; 20 years at hard labor without benefit of probation, parole, or suspension of sentence for felon in possession of a firearm; and 30 years at hard labor for conspiracy to commit obstruction of justice.

FACTS

The Murders

Theodore Pierce was murdered outside of a friend’s house in Bridge City on January 2, 2011. Co-defendants McClure and Griffin were arrested shortly thereafter and charged with his murder. Pierce’s murder was witnessed by Charles Smith, a neighbor, who gave a statement to the police and who identified McClure and Griffin as the shooters in photographic lineups two days after the murder.
In his recorded statement, Smith explained that he witnessed McClure and Griffin, whom he occasionally saw walking around the neighborhood, shoot at Pierce while they were standing in front of a *496 neighbor’s house located at 301 Fourth St.[3] Smith stated that the duo were initially standing in the street and then made their way into the yard while they shot at Pierce. He then observed McClure approach Pierce and “finish him off.” Smith further stated that he saw a second male on the scene at the time of the shooting but did not see his face or notice whether he had a gun. Smith confirmed that Pierce did not have a gun and was not shooting back at McClure or Griffin.
| ¿Smith also told police during his statement that the day after the shooting, McClure drove to his house armed with a gun and confronted him stating, “I heard you talking about, about the, the shooting,” to which Smith responded that he had not been talking about anything. Smith stated that he believed his life was in danger because he had witnessed the murder.
At approximately noon on August 17, 2011, the day before a scheduled motion hearing to determine the admissibility of the photographic identifications made by Smith of McClure and Griffin as the shooters in Pierce’s murder, Smith was found shot to death in front of his home located on Fourth Street in Bridge City.[4] Eight casings were found at the scene and Jene Rauch, a firearm and tool mark examiner expert, opined that one gun was used in the shooting. An autopsy revealed that Smith died of multiple gunshot wounds to his head, chest and leg. The murder weapon was never recovered.
Smith’s friend, John Stewart, was visiting Smith at his house on Fourth St. when Smith was shot. Stewart testified that while he was in the bathroom, Smith went outside to check the mail, at which time Stewart heard several gunshots. Stewart went to the door, looked out, and saw Smith’s feet. He immediately called 9-1-1. When Stewart stepped outside, he saw a young black male with dreadlocks, wearing a black “wife beater,” blue shorts, and a black bandana over his head, jump over the fence. Stewart was unable to see the man’s face because it was partially covered; hence, Stewart was unable to identify the man from a photographic lineup. At trial, the parties stipulated that at the time of Smith’s murder, Defendant was a young black man with dreadlocks.
|5Colonel Timothy Scanlan, an expert in crime scene reconstruction, testified that the evidence was consistent with a “targeted action,” meaning one mobile shooter started shooting from the ré'ar of the residence in a place of cover and then moved forward down the fence line. He opined the evidence was consistent with someone who was waiting to attack Smith when he came out of his home.
Detective Matthew Vasquez of the Jefferson Parish Sheriffs Office (JPSO) investigated Smith’s murder. Because Smith was an eyewitness to Pierce’s murder and because Smith’s murder occurred the day before a hearing set in the Pierce case, Det. Vasquez believed Smith’s murder was not a coincidence. Accordingly, Det. Vasquez started to look into McClure’s and Griffin’s backgrounds and associates. He found that Defendant, McClure’s brother, fit the description of Smith’s assailant provided by Stewart. Det. Vasquez’s focus on Defendant intensified after he listened to recorded phone *497 conversations from the Jefferson Parish Correctional Center (JPCC) between McClure and Defendant in the hours after Smith’s murder.[5] Det. Vasquez subsequently subpoenaed Defendant’s cell phone records which showed that he was in the area of Smith’s residence at the time of his murder and left the area soon thereafter.
Defendant was arrested on unrelated outstanding attachments and questioned about Smith’s murder. After being advised of his rights, Defendant gave two taped statements. In his first statement, Defendant denied knowing Smith and was unable to say what he was doing on the day of Smith’s murder. Defendant also denied owning a cell phone. When confronted with his cell phone records, Defendant admitted he had lied and ultimately admitted that he used his cell phone to talk to McClure while McClure was in jail.
|fiIn his second statement, Defendant claimed he was in Marrero with a friend named “Roy” on the day of Smith’s murder and that he did not return to Bridge City until the next day.[6] Det. Vasquez then confronted Defendant with his cell phone records which placed him in Bridge City at the time Smith was killed. Defendant became agitated and angry and said, “ft *k the cell phone records.” Defendant questioned how anyone was going to identify him if the shooter had a mask over his face. When Det. Vasquez asked how Defendant knew that information, Defendant explained that his mother and friends had been in court when the suspect’s description had been discussed. Det. Vasquez then played the phone conversation between McClure and Defendant that took place six hours after the shooting wherein McClure asked whether the information he heard about “Dude” was true. Defendant stated “Dude” referenced a family member, but could not say who the family member was or his relationship. Also in that phone conversation, Defendant told McClure that their mother did not want him talking to McClure because the call could be traced. When Det. Vasquez asked Defendant why he was worried about being traced if they were only talking about a relative, Defendant became very angry and told Det. Vasquez to “just book me then. I’m done. Just book me.” Defendant was subsequently charged with Smith’s murder.

The Conspiracy

During his investigation of Smith’s murder, Det. Vasquez listened to “hundreds of hours” of jailhouse phone calls made by McClure and Griffin from the JPCC both before and after Smith’s murder.[7] Det. Vasquez explained that while neither McClure, Griffin, nor Defendant admitted killing Smith in any of these phone calls, he .identified several phone calls that he deemed significant. He |7had those calls transcribed and excerpts were played for the jury, beginning with a phone call on January 6, 2011, a few days after Pierce’s murder. During the playing of these phone calls for the jury, Det. Vasquez offered testimony as to who was talking *498 and the meaning of the “code” language being used.
In the January 6, 2011 phone call from McClure to an unknown male, McClure stated that he’s “good” as “[l]ong as the n*gg* don’t say nothing.” The next day McClure assured his mother that everything was alright “long as nobody don’t say nothing.” In a call to his brother, Frank, two days later, McClure indicated that the police claimed they had one witness and “n*gg* already know who the witness is.”
On January 25, 2011, McClure and an unknown female facilitated a three-way call with Defendant during which McClure stated, “I ain’t trippin’ ... They don’t got no witness ... Well, they got one witness, but ... he ain’t coming to court or whatever, woo di woo.” Two days later, Defendant asked McClure how he got caught to which McClure responded, “I was acting stupid ... I was acting dumb as a mother-f* *ker son ... I was on the wrong level son.”[8]
Four days later, on January 29, 2011, McClure had another three-way call with his friend, Willis Stevenson, and Defendant. During the call, Stevenson told McClure that Griffin had not been to court and that Griffin’s attorney said she would be going home in 120 days because the State did not any evidence against her. McClure responded, “Right, yeah cause my lawyer was like ‘uh you know they got one witness but uh your little brother is on that.’ When he told me that, I already know what it was (laughing), ya heard me?” Stevenson then told McClure |sabout a conversation Griffin’s father, Terrence Daniels, had with Smith. Specifically, Stevenson said, “T went over there today, cause he was with Scooby ya know what I’m saying. So boy Scooby brought him, n*gg* was at the Fishhook. Ya know what I’m saying, he brought him to the Fishhook, I guess that where he felt comfortable at or whatever.” Later at trial, Smith’s girlfriend, Margie McKeel, testified about an incident where Smith had told her that Griffin’s father had threatened his life, telling Smith that “he better not testify or else there’s going to be gun-play.”
A few months later, on June 2, 2011, Griffin called an unknown female and told her that her attorney was going to set Griffin’s next court date for June 23 but that Griffin told her attorney the date was “too early.” Griffin explained that they needed to get their discovery packets. She stated that Defendant “was hollering about ... other lil dude whose name starts with a C, ya heard me. You know who I’m talking about_I think it’s Troy’s brother, lives on Fourth Street. I ain’t gonna say his name.”[9] Later on the same day, Griffin made a call to an unknown male and told him that “they only got one witness,” who she identified as “Chariest,] Troy’s brother.” She further stated that his statement did not add up and that “he really didn’t like see nothing.”
Two days later on June 4, 2011, Griffin spoke to a man named Louis Wells and told him to contact Smith’s girlfriend, *499 McKeel, to see what is “happening with Dude” who is “speaking on me and Q-sie [McClure].” Wells responded that he heard McKeel was staying in Algiers and that he had not seen her “back here.” Wells then handed the phone to Griffin’s brother. Griffin told her brother, “I need that boy, ya heard me?”
1 qDuring another conversation between Griffin and her brother on June 8, 2011, her brother stated, “heard we pulling something off’ and that “Lil Jeff [Defendant]” is “all in.” Griffin later told her brother to acquire a “b*tch,” which was interpreted by Det. Vasquez to be slang for an untraceable firearm.[10] She then stated, “if you go f* *k with Dude or whatever — whatever man, you could do your own thing or whatever. You could take everything from there, ya heard me?” to which her brother responded, “[s]h*t gonna be lovely when you come home, son.”
The next day on June 9, 2011, McClure spoke to Defendant. When Defendant asked McClure whether “Dude” was going to testify, McClure responded “[n]ine out of ten, he ain’t going to f*ck with that.” He further informed Defendant that Griffin told him that they did not know where “Dude” was and “that’s going to work out in my favor.”
One month later, on July 8, 2011, McClure spoke to his mother who told him that the discovery packet provided by the State identified Smith as a witness. McClure’s mother told him that his next court date was set for August 18, 2011. Three days before Smith’s murder, on August 14, 2011, McClure told his friend Stevenson that he received his “paperwork” and that “Dude” was the only person who said something and he was the only reason he was being held. Stevenson then talked to McClure about having spoken to Griffin.
Six hours after Smith was murdered on August 17, 2011, McClure called Defendant and asked him whether he had heard the news about Smith and inquired as to whether it was true. Defendant answered, “[y]eah,” to which McClure responded “[w]ell, that’s good.” Defendant then told McClure that their mother | indid not want him talking to McClure because the call could be traced “[s]ince that sh*t happen[ed].” McClure responded, “[f]* *k it I ain’t going to call at all ... F* *k everybody, I ain’t worried about it. I’ll be home soon.” The next day, Griffin called an unknown male and told him that she was going to be released from jail. She stated, “Oh yeah, that b*tch come from court, I didn’t go though, but uh, they had slammed that Dude, you heard me?' .. They had slammed that boy.” The unknown male responded, “Oh, I had heard about that sh*t.”

ISSUES

Defendant raises four issues on appeal: (1) the sufficiency of the evidence; (2) the denial of challenges for cause as to four prospective jurors; (3) the admission of Det. Vasquez’s testimony interpreting the jailhouse phone calls of McClure and Griffin on the basis he was not qualified as an expert; and (4) the denial of his right to *500 present a defense on the basis he was not allowed to fully cross-examine Det. Vasquez.

DISCUSSION

Sufficiency of the Evidence[11]
Defendant challenges the sufficiency of the evidence on the basis the State failed to prove his identity as the perpetrator of the crimes. He claims that the only evidence linking him to the murder of Smith is the erroneously admitted testimony of Det. Vasquez during which he identified various jailhouse phone calls between Defendant, McClure and Griffin allegedly conspiring to kill Smith. He contends Inthat several reasonable hypotheses of innocence were presented and not validly considered by the jury.
The standard of review for determining the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but rather whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. State v. Flores, 10-651 (La.App. 5 Cir. 5/24/11); 66 So.3d 1118,1122.
In this case, Defendant was convicted of the second degree murder of Smith, felon in possession of a firearm, and conspiracy to commit obstruction of justice. Defendant does not contest that the State failed to prove any of the essential statutory elements of the crimes for which he was convicted,[12] but rather only challenges his convictions on the basis that the evidence was insufficient to prove his identity as the perpetrator of the offenses.
Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. State v. Ray, 12-684 (La.App. 5 Cir. 4/10/13); 115 So.3d 17, 20, writ denied, 13-1115 (La.10/25/13); 124 So.3d 1096. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. |]2/⅛ *501 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’ testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. State v. Caffrey, 08-717 (La.App. 5 Cir. 5/12/09); 15 So.3d 198, 202, writ denied, 09-1305 (La.2/5/10); 27 So.3d 297.
In this case, Defendant’s identity as the shooter was established by circumstantial evidence. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05); 904 So.2d 830, 833. It is long established that where circumstantial evidence forms the basis of a conviction, the circumstance’s must be so clearly proven that they point not merely to the possibility or probability of guilt but to the moral certainty of guilt. State v. Shapiro, 431 So.2d 372, 385 (La.1982). The rule as to circumstantial evidence is “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. This is not a separate test from the Jackson standard but rather provides a helpful basis for determining the existence of reasonable doubt. State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99); 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00); 753 So.2d 208. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id.
To preserve the role of the fact-finder, i.e., to accord the deference demanded by Jackson, the Louisiana Supreme Court has further subscribed to the general principle in cases involving circumstantial evidence that when the factfinder at trial reasonably rejects the hypothesis of innocence advanced by the defendant, “that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.” State v. Captville, 448 So.2d 676, 680 (La.1984). A reasonable alternative hypothesis is not one “which could explain the events in an exculpatory fashion,” but one that “is sufficiently reasonable that a rational juror could not ‘have found proof of guilt beyond a reasonable doubt.’ ” Id. (quoting Jackson, supra).
In State v. Mack, 13-1311 (La.5/7/14); 144 So.3d 983, the Louisiana Supreme Court found circumstantial evidence establishing that the defendant had threatened the victim, coupled with a web of cell phone calls among the defendant, an alleged accomplice/shooter, and an unknown third party, was sufficient to support the defendant’s conviction for second degree murder.
In Mack, the defendant was convicted as being a principal to murder based on circumstantial evidence consisting of cell phone records .that tied the defendant’s cell phone number to that of the shooter and an unknown third party. The evidence showed that the defendant, who had intervened in an argument between the victim and one of the victim’s friends, used his cell phone to orchestrate the victim’s demise after exchanging words with the intoxicated victim and warning him “[y]ou know, I’m Sam Mack. You know what I could have done to you.” After -the defendant admonished the victim, the defendant used his cell phone to make a call or to text. The defendant then walked away and was not seen again that evening. Hours later, the victim was shot by someone other than the- defendant. The victim’s friends identified the shooter, who was later arrested and found to be in possession of the murder weapon and a cell phone with the defendant’s number *502 saved in it. The State presented cell phone records that showed twelve calls took place between the defendant and the shooter in the hours before and after the shooting in addition to calls between the shooter and an unknown third party.
| uThe Fourth Circuit reversed the defendant’s conviction finding that the State’s case rested wholly on circumstantial evidence that “did not exclude that another logical inference, other than to procure murder, could be drawn from these phone calls.” The dissent noted that it would be “an extraordinary coincidence if it was not all interrelated — [the shooter’s] otherwise unexplained arrival on the scene within twenty minutes of the last phone call between the two cell phones and his otherwise unexplained brutal execution of the victim within the same twenty minute period.”
In reversing the Fourth Circuit, the supreme court agreed with the dissent and reinstated the defendant’s conviction, finding that the jurors had “an evidentiary basis for rationally rejecting the primary hypothesis of innocence advanced by the defense and the alternative hypothesis as well, for which there existed absolutely no evidence, that someone else recruited [the shooter] to take advantage of the situation and to murder the intoxicated [victim].” Mack, 144 So.3d at 990. The supreme court noted that the question for the court of appeal was whether “the various alternative hypotheses advanced by the defendant on appeal, and in this Court, did not simply offer a possible exculpatory explanation but were so reasonable that rational jurors would necessarily have looked past [the dissent’s] ‘extraordinary coincidence’ if all the calls were not interrelated and found a reasonable doubt of defendant’s guilt.” Id. The supreme court concluded that the State’s theory of the prosecution was consistent overall with the evidence introduced at trial, while the defense hypotheses lacked any evidentiary basis. Thus, after giving deference to the trier of fact’s resolution of conflicting inferences, the supreme court held that the evidence was sufficient to convince a rational trier of fact beyond a reasonable doubt that the defendant was a principal to the victim’s murder. Mack, 144 So.3d at 991.
11sIn this case, as in Mack, Defendant’s convictions were based primarily on circumstantial evidence. On appeal, Defendant argues that he proposed “several reasonable hypothesis (sic) of innocence” that were not validly considered by the jury; however, he does not set forth what these “reasonable hypotheses” are.
Here, the jury was presented with Smith’s statement and grand jury testimony in which he conveyed a fear for his life based on his witnessing Pierce’s murder and his identification of McClure and Griffin as the shooters. Smith and his girlfriend, McKeel, also indicated that Smith’s life was threatened on more than one occasion, both by McClure and by Griffin’s father. Det. Vasquez further testified as to numerous jailhouse phone calls made by McClure and Griffin while incarcerated which set forth their plan to defeat their pending murder charges by killing the only witness against them. Defendant’s participation in this conspiracy was established through various recorded jail conversations.
Specifically, Defendant’s knowledge that McClure and Griffin killed Pierce was established via a conversation between Defendant and McClure in the month after the murder in which Defendant asked McClure, “how in the hell you got caught?” Additionally, there were several discussions between Defendant and McClure about Smith being the only eyewitness. Defendant’s recruitment as the gunman was established during a three-way phone *503 call involving Defendant, McClure, and McClure’s friend, Stevenson. During this call, McClure communicated to Stevenson that his attorney told him “ ‘you know they got one witness but uh your little brother is on that,’ ... when he told me that, I already know what it was (laughing), ya heard me?” Defendant was also identified as the man tasked with ensuring Smith would be unavailable to testify at Pierce’s murder trial in a phone call between Griffin and her brother in June 2011. During this conversation, Griffin’s brother told Griffin that he “heard we pulling something 11fioff,” and that “Lil Jeff,” [13] is “all in with a n*gg*,” prompting Griffin’s response, “[o]h, I know. I cornin’ home.” The next day, Defendant spoke to McClure and asked whether “Dude” was going to testify. McClure explained to Defendant that he spoke to Griffin in court who indicated that she was attempting to locate Smith but had been unsuccessful.
The testimony at trial further established that one month before Smith’s murder, McClure was informed by his mother that the State officially named Smith in discovery as a witness and that McClure’s next court date was set for August 18, 2011. Smith was murdered on August 17, 2011. Additionally, six hours after Smith’s murder, McClure spoke to Defendant who confirmed that Smith had been killed. Upon hearing the news "of Smith’s death, McClure stated “[w]ell, that’s good,” and later told Defendant, “I’ll be home soon.” Defendant then advised McClure that their mother did not want them talking on the phone because the call could be traced “since that s* * * happen[ed].” Defendant further warned McClure that they had to be careful about “Renata” because he heard that she was going to tell the police that they “did that s* * The day after Smith’s murder, Griffin stated, “them b*tches going to release me Monday” because “[t]hey had slammed that dude.”
The jurors also heard the testimony of the only witness to Smith’s murder, John Stewart, a friend of Smith’s who was at his house at the time Smith was murdered. Stewart testified that although he could not see the shooter’s face because it was partially covered with a bandana, he observed a young black male with dreadlocks jump over the fence immediately after hearing shots being fired. Defendant fit this general description as established by the parties’ stipulation that at the time of Smith’s murder defendant was a young black man with dreadlocks. |17Colonel Scanlan also testified that the physical evidence at the scene was consistent with a “targeted action,” and that the pattern of gunfire was also consistent with someone awaiting the opportunity to attack Smith as he exited his home.
Defendant’s cell phone records placed him in the area of Smith’s residence at the time of his murder and show that he left the area soon after the murder. In his statement to the police, Defendant stated he would “do anything for his brother.”
Defendant admitted to being in possession of his cell phone at the time of Smith’s murder; however, the alibi he gave police regarding his whereabouts at the time of the murder was directly contradicted by his cell phone records. Specifically, Defendant told the police that he was nowhere near Bridge City on the day Smith was murdered but rather was at his friend “Roy’s” house in Marrero; but, his cell phone records placed him in the area of the murder at the time in question. When confronted with these inconsistencies, Defendant made an unprompted comment to Det. Vasquez expressing his knowledge of *504 the particulars of the murder (after having previously denied knowledge of the murder) through his statement: “how’s somebody going to say I did it if the guy who killed him (Smith) had a mask over his face?”[14]
Based on the evidence presented, we find the jurors had an evidentiary basis for rationally rejecting the primary alibi hypothesis of innocence advanced by Defendant, which was lacking in evidentiary support, and in accepting the State’s theory of prosecution, which was consistent with the overall evidence introduced at 11Rtrial. Accordingly, we find that viewing the evidence in the light most favorable to the prosecution, a rational juror could have found Defendant’s identity as the perpetrator in the crimes of second degree murder of Smith, felon in possession of a firearm,[15] and conspiracy to commit obstruction of justice, beyond a reasonable doubt.

Challenges for Cause

Defendant next argues that the trial court erred in denying his challenges for cause as to four prospective jurors: Marguerite Rankin, Maley Morris, Janis Brit-son, and Sheree Caminita. He maintains these prospective jurors’ responses during voir dire rendered them incapable of putting aside their beliefs and/or relationships in order to enable them to follow the law, thus rendering them incapable of being fair and impartial.
The Sixth Amendment to the United States Constitution guarantees the accused the right to trial by an impartial jury. State v. Munson, 12-327 (La.App. 5 Cir. 4/10/13); 115 So.3d 6, 12, writ denied, 13-1083 (La.11/22/13); 126 So.3d 476. Further, La. Const. Art. I, § 17 guarantees the accused the right to full voir dire examination of prospective jurors and the right to challenge those jurors peremptorily-
Jurors may also be challenged for cause based on those grounds set forth in La.C.Cr.P. art. 797. A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Campbell, 06-286 (La.5/21/08); 983 So.2d 810, 858, cert. denied, 555 U.S. 1040, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008). A trial court’s ruling on a challenge for cause will only |1flbe reversed where it appears, upon review of the voir dire examination as a whole, that the trial court’s exercise of its discretion has been arbitrary or unreasonable, resulting in prejudice to the accused. State v. Lee, 93-2810 (La.5/23/94); 637 So.2d 102, 108; State v. Passman, 345 So.2d 874, 880 (La.1977).
In order to prove reversible error warranting reversal of a defendant’s conviction, the defendant must show (1) the erroneous denial of a challenge for cause; and (2) the use of all of his peremptory *505 challenges. State v. Jones, 03-3542 (La.10/19/04); 884 So.2d 582, 588-89. When a defendant uses all of his peremptory challenges, a trial court’s erroneous ruling on a challenge for cause which deprives him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights. In this situation, prejudice is presumed and the conviction and sentence must be reversed. Id. at 588.
Under La.C.Cr.P. art. 799, a defendant is entitled to 12 peremptory challenges in the trial of offenses punishable necessarily by imprisonment at hard labor. In this case, the charged offenses of second degree murder, felon in possession of a firearm and conspiracy to commit obstruction of justice all require punishment by imprisonment at hard labor;[16] therefore, Defendant was entitled to 12 peremptory challenges. The record shows that Defendant did not exhaust his peremptory challenges, but rather only used four of his 12 peremptory challenges.[17] Thus, he cannot demonstrate prejudice, which is required for proving reversible error warranting the reversal of his conviction. The law is well-established that a defendant’s failure to exhaust his peremptory challenges bars review on appeal of a claim that the trial court erroneously denied the challenges for cause. See State «J¡¡¡Jones, 884 So.2d at 591. Accordingly, we do not reach the issue of whether there was an erroneous denial of Defendant’s challenges for cause.

Admission of Det. Vasquez’s Testimony

In this assignment of error, Defendant argues the trial court erred in allowing Det. Vasquez to testify as a lay witness as to his interpretations of the meanings of various recorded jailhouse conversations and the slang used therein and the identity of the speakers in the phone calls. Defendant contends Det. Vasquez’s interpretive testimony was the only evidence linking him to Smith’s murder and to the conspiracy. Thus, Defendant maintains the admission of this evidence was not harmless error.
At trial, numerous taped jailhouse phone calls made using McClure’s and Griffin’s assigned PIN numbers were introduced into evidence and played for the jury during the testimony of Det. Vasquez. At the beginning of Det. Vasquez’s testimony, Griffin’s attorney made a preemptive objection to Det. Vasquez’s interpretation of the phone calls, including his decipherment of the “code” the speakers may have been using.[18] The State contended that Det. Vasquez would be identifying the speakers and translating their conversations on the basis of his experience as a police officer. Griffin’s attorney maintained that Det. Vasquez’s translation was beyond lay witness testimony and required his qualifica *506 tion as an expert witness in street slang. The trial court found the objection premature.
After a weekend recess, the matter was discussed in further detail prior to the continuance of Det. Vasquez’s testimony. Defense counsel’s main objection was to Det. Vasquez’s anticipated interpretation of the term “b*tch,” as used by Griffin in one of the phone calls, to mean a firearm. The trial court ruled that Det. |⅞1 Vasquez would be prohibited from interpreting Griffin’s state of mind or her intent at the time of her statement, but that he would be permitted to explain to the jury what he has come to know the term “b*tch” to mean based on his many years of experience on the street as a police officer. The trial court determined Det. Vasquez’s testimony in this regard did not require him to be qualified as an expert.
Det. Vasquez then proceeded to testify that he listened to “hundreds of hours” of recorded jailhouse phone calls made by McClure and Griffin to individuals outside the jail. Det. Vasquez testified that the defendants used lots of “code talk” and nicknames in their conversations. He explained that he was able to identify the various individuals participating in the telephone conversations based on listening to hours of phone calls and hearing names mentioned during the calls which identified the person being spoken to. Det. Vasquez stated that in those circumstances where he could not identify the speaker, he referenced the speaker as “unknown male” or “unknown female.” He admitted on cross-examination that he was not a voice expert, but stated that he had come to learn the various voices after listening to the hours and hours” of phone calls and corresponding PIN numbers.[19]
Det. Vasquez testified that of the 17 discs of recorded phone calls, he found seven of the discs to be relevant to the investigation of the present case. The pertinent phone conversations were transcribed and played for the jury. One of the key phone calls was on June 8, 2011 between Griffin and her brother, wherein Griffin used the term “b*tch” several times. Det. Vasquez explained that in his nine years as a police officers and the “countless” cases he has investigated, he has become familiar with the use of various slang terms used by individuals who live in the communities he patrols within Jefferson Parish. He testified that he has 122heard the term “b*tch” used in a variety different contexts, and that in the context of the phone call at issue the term referred to an untraceable gun.
The testimony of a lay witness in the form of opinions or inferences, who is not testifying as an expert, is limited to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determination of a fact in issue. La. C.E. art. 701; State v. Keller, 09-403 (La.App. 5 Cir. 12/29/09); 30 So.3d 919, 930-31, writ denied, 10-267 (La.9/17/10); 45 So.3d 1041. A law officer may testify as to matters within his personal knowledge acquired through experience without first being qualified as an expert. See State v. Le-Blanc, 05-885 (La.App. 1 Cir. 2/10/06); 928 So.2d 599, 603. However, only experts are allowed to give opinion testimony in areas of specialized knowledge.[20] A reviewing *507 court must ask two questions to determine whether the trial court properly allowed lay opinion testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness’ observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. Id. at 602-03.
“Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact.” La. C.E. art. 704; State v. Higgins, 03-1980 (La.4/1/05); 898 So.2d 1219, 1234, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). In other words, the fact an opinion or inference embraces an ultimate issue in a case does not preclude its admissibility. La. C.E. art. 704, Comment (c); State v. King, 99-1279 (La.App. 5 Cir. 4/25/00); 760 So.2d 540, 543, writs denied, 00-|1452¾ and 00-1498 (La.3/16/01); 787 So.2d 298. The trial court is vested with much discretion in determining which opinion testimony shall be received into evidence as lay or expert testimony. State v. Friday, 10-2309 (La.App. 1 Cir. 6/17/11); 73 So.3d 913, 922, writ denied, 11-1456 (La.4/20/12); 85 So.3d 1258.
Upon review, we find the trial court did not err in allowing Det. Vasquez to testify as a lay witness under La. C.E. art. 701 as to inferences regarding the contents of the recorded phone conversations based on his own observations and experiences. In State v. Decay, 01-192 (La.App. 5 Cir. 9/13/01); 798 So.2d 1057, 1072-74, writ denied, 01-2724 (La.8/30/02); 823 So.2d 939, this Court found a trooper’s testimony interpreting “slang” in a telephone conversation to be permissible lay testimony under La. C.E. art. 701, despite the defendant’s argument that expert testimony was required and that the trooper had not been qualified as an expert. The trooper in Decay interpreted the defendant’s statement, “I be trying to get me about two, bra,” to mean that the defendant wished to buy two kilograms of cocaine. This Court determined that the trooper’s testimony was to inferences made based on his observations and his experience of being a State trooper for seven years.
Additionally, in State v. Jefferson, 04-1960 (La.App. 4 Cir. 12/21/05); 922 So.2d 577, 596-97, writ denied, 06-940 (La.10/27/06); 939 So.2d 1276, the defendant objected to a detective’s identification of an eyewitness’ voice on a 9-1-1 recording. The detective testified that he recognized the witness’ voice based on the time he spent with him during his interview and investigation of the case. The Fourth' Circuit found the detective’s opinion regarding the identification of the voice was rationally based on his perception and was helpful to a determination of a fact in issue regarding the phone call, thereby satisfying the requirements of La. C.E. art. 701.
[^Furthermore, we are persuaded by King v. United States, 74 A.3d 678 (D.C. 2013), cited by the State, which interprets the Federal Rules of Evidence upon which La. C.E. art. 701 is based.[21] In King, the defendant argued the trial court erred in allowing a police officer and a detective to testify as lay witnesses as to the meaning of certain “street lingo” used in recorded jailhouse phone calls.[22] The defendant *508 maintained the officers were testifying about a specialized subject beyond the understanding of the average lay person. The officers explained that they based their “street lingo” interpretations on their lengthy experience working on criminal investigations in the area and regularly speaking about crime with young people in that community. The appellate court found the trial court properly admitted the officers’ testimony as lay witness testimony because “the witnesses based their opinions on their personal experiences and observations and used reasoning processes familiar to the average person in everyday life to reach their proffered opinion.”
The appellate court explained that lay testimony is that which “results from a process of reasoning familiar in everyday life,” whereas “an expert’s testimony results from a process of reasoning which can be mastered only by specialists in the field.” King, 74 A.3d at 682 (internal citations omitted). The court concluded that the “reasoning process employed to interpret the street language was the everyday process of language acquisition” and that the officers “did not use any special training or scientific or other specialized professional knowledge to form their opinions about the meaning of the language used by the individuals in this case.” Id. at 683.
I j>fiIn this case, Det. Vasquez testified as to his opinion of the meaning of certain “slang” words in the recorded phone calls based on his personal experiences and observations. Specifically, Det. Vasquez stated that his knowledge was gained from his nine years of experience as a police officer and the “countless” cases he has investigated in the community. He explained that he has come to understand the meaning of various slang terms through his contact with and interviewing of various individuals during his employment as a police officer. He further explained that he was able to identify the various individuals in the phone calls from listening to “hundreds of hours” of phone calls involving the defendants and his investigation into the case.
Thus, we conclude that Det. Vasquez’s opinion was properly admitted as lay testimony that resulted from his observations and experiences as a police officer. We find his opinions resulted from the “process of reasoning familiar in everyday life,” as opposed to “a process of reasoning which can be mastered only by specialists in the field.” Further, Det. Vasquez’s testimony provided the jury with relevant factual information about the investigation, including the meanings of terms used in the conversations and the identification of the individuals referenced during the phone calls.

Right to Present a Defense

Defendant argues that he was denied his right to present a defense as to the conspiracy charge. Specifically, he claims that the defense was not allowed to cross-examine Det. Vasquez on the evidence of a conspiracy presented by the State.
Both the Sixth Amendment of the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. State v. Lirette, 11-1167 (La.App. 5 Cir. 6/28/12); 102 So.3d 801, 813, writ denied, 12-1694 (La.2/22/13); 108 So.3d 763. This right does not require a trial court to permit the introduction of evidence that is inadmissible, irrelevant, or has so little probative value that it is substantially outweighed by other legitimate *509 considerations in the administration of justice. Id. The trial court is accorded great discretion in evidentiary rulings and, absent a clear abuse of that discretion, rulings regarding the relevancy and admissibility of evidence will not be disturbed on appeal. State v. Sandoval, 02-230 (La.App. 5 Cir. 2/25/03); 841 So.2d 977, 985, writ denied, 03-853 (La.10/3/03); 855 So.2d 308.
Defendant’s counsel was the first to cross-examine Det. Vasquez, and he completed his cross-examination without any objections by the State. Det. Vasquez was next cross-examined by McClure’s counsel. During his cross-examination, defense counsel asked, “Now you alluded to conspiracy. What is conspiracy, Detective?” The State objected and the trial court sustained the objection on the basis it was “a question of law for the Court to define for the jury, not for any witness.” The record shows defense counsel continued to question Det. Vasquez about the jailhouse phone calls covering over 34 pages of the transcript. The State subsequently made three more objections: one as to the form of one of defense counsel’s question, which resulted in defense counsel rephrasing the question; one which was overruled and had no effect; and one which the State admitted was in error and had no effect. Griffin’s counsel completed the cross-examination of Det. Vasquez. During his questioning, the State objected once to the admission of evidence pertaining to an urban dictionary, resulting in a proffer of the evidence. Defense counsel then questioned Det. Vasquez as to the meaning of certain words using the Oxford Dictionary.
It is unclear how Defendant was prevented from presenting a defense on the conspiracy charge. The defense cross-examined Det. Vasquez extensively about bgthe jailhouse phone calls, even re-playing some of the calls in their entirety to the jury. None of the trial court’s rulings prevented Defendant from fully cross-examining Det. Vasquez regarding the jailhouse phone calls, or conspiracy evidence, and the identity of the speakers and the meaning of the conversations. Accordingly, we find no merit to this assignment of error.

ERRORS PATENT

Upon review of the record for errors patent under La.C.Cr.P. art. 920, we note the following errors that require corrective action.
First, the State of Louisiana Uniform Commitment Order reflects the date of adjudication as September 9, 2013; however, the record reflects that the date of adjudication was actually August 14, 2013. Additionally, the Uniform Commitment Order does not set forth the offense date for each of Defendant’s convictions. Specifically, the second degree murder and felon in possession of a firearm were committed on August 17, 2011, and the conspiracy to commit obstruction of justice was committed on or between January 3, 2011 and August 17, 2011. Furthermore, the Uniform Commitment Order does not reflect Defendant’s life sentence imposed on the second degree murder conviction, but rather reflects his sentence as “0 yr/0 m/Od.”
Second, there is a discrepancy between the transcript and the commitment.[23] The transcript reflects that the trial court imposed Defendant’s life sentence for second degree murder and 20-year sentence for felon in possession of a firearm without benefit of parole, probation, or suspension of sentence. However, neither the com *510 mitment nor the Uniform Commitment Order reflects the restriction of these benefits. While we note the mandatory restriction of benefits is selfjactivating,[24]28 we order correction of the commitment and Uniform Commitment Order in this regard because of other errors in the Uniform Commitment Order that require a remand for correction.
Accordingly, we remand the matter for correction of the commitment and the State of Louisiana Uniform Commitment Order as noted above, and the Clerk of Court for the 24th Judicial District Court is ordered to transmit the original of the corrected commitment and Uniform Commitment Order to the officer in charge of the institution to which Defendant has been sentenced and the Department of Corrections’ legal department. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12); 106 So.3d 1136, 1142.

DECREE

For the foregoing reasons, Defendant, Jeffery Nelson’s, convictions and sentences are hereby affirmed. The matter is remanded for the correction of the commitment and the Uniform Commitment Order as instructed above.

CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF COMMITMENT.

. Co-defendants, Quentin McClure and Chasity Griffin, were also charged in the same indictment with conspiracy to commit obstruction of justice. Additionally, McClure and Griffin were charged with the second degree murder of Theodore Pierce and possession of a firearm by a convicted felon (McClure was charged with two counts). McClure was further charged with intimidation of a witness.

. Co-defendants McClure and Griffin were also found guilty on all charged offenses. The appeals of McClure and Griffin have been separately docketed in this Court under case numbers 14-KA-253 and 14-KA-251, respectively.

. Brenda Mitchell lived at this address. She told police that she saw someone shooting, but she could not identify the shooter.

. The trial court took judicial notice of the fact the record did not contain a subpoena for Smith to testify at the August 18, 2011 motion hearing. Detective Matthew Vasquez, who investigated Smith’s murder, explained to the jury that eyewitnesses are not typically called to testify at such pretrial hearings, but rather police officers are the ones who testify.

.In this phone conversation McClure asked Defendant, "[i]s that sh*t I hear about Dude true?” to which Defendant responded ”[y]eah.” McClure then stated, "I'll be home soon,” and "[w]e have to watch that girl Ranata. She might tell them people that we did that sh*t.” Det. Vasquez explained that he determined "Dude” to be Smith and that the term "them people” is a term used for the police.

. Defendant was unable to provide a last name or address for Roy and the police were unable to confirm Roy as a real person.

. Det. Vasquez explained that each inmate has a PIN, or identification, number that he or she enters when making a call and that all phone calls are recorded.

. On cross-examination, Det. Vasquez disagreed with McClure’s counsel who argued that McClure was not the person speaking during this portion of the phone conversation. Counsel argued that McClure handed the phone to someone in jail named ''Jeb or Jab,” a.k.a. Jabori Davis, and that it was Davis, not McClure, who was talking about how he got caught. Defense witness Jeremy Feazell testified that the voice previously identified by Det. Vasquez as McClure’s, was actually his cousin, Davis', voice. The parties stipulated that Davis was incarcerated in JPCC at the time of the phone call on January 27, 2011, and that he a court date in February 2011.

. Det. Vasquez testified that Griffin was referring to Charles Smith.

. Griffin testified that this phone conversation was misinterpreted by Det. Vasquez. She claimed that her brother’s statement, "heard we pulling something off,” referred to her brother’s attempt to acquire funds to pay for her lawyer. Griffin explained that her brother wanted to sell drugs to pay her lawyer's fee but he was having trouble getting the drugs from a supplier. Griffin explained her reference to the term "b*tch” was a reference to her drug supplier’s female friends. According to Griffin, she told her brother to contact one of the supplier’s female friends, a.k.a. "b*tch,” and have them buy the drugs because the supplier would be more inclined to sell drugs to one of his "girls.”

. We note that in this assignment of error, Defendant presents the issue of sufficiency of the evidence by challenging the denial of his motion for new trial. At trial, Defendant filed a motion for judgment of acquittal and in the alternative a motion for new for new trial claiming the evidence was insufficient to support his convictions. Under La.C.Cr.P. art. 851(1), the trial court shall grant a motion for new trial whenever the verdict is contrary to the law and the evidence. A motion for new trial on this basis presents only the issue of the weight of the evidence and is not subject to review on appeal. State v. Bazley, 09-358 (La.App. 5 Cir. 1/11/11); 60 So.3d 7, 19, writ denied, 11-282 (La.6/17/11); 63 So.3d 1039; State v. Coleman, 32,906 (La.App. 2 Cir. 4/5/00); 756 So.2d 1218, 1228, writ denied, 00-1572 (La.3/23/01); 787 So.2d 1010. While we nonetheless address the sufficiency of the evidence in such circumstance, a motion for post-verdict judgment of acquittal is the proper procedural vehicle to raise the sufficiency of the evidence. State v. Thomas, 08-813 (La.App. 5 Cir. 4/28/09); 13 So.3d 603, 606 n. 3, writ denied, 09-1294 (La.4/5/10); 31 So.3d 361; State v. Lyles, OS-141 (La.App. 5 Cir. 9/16/03); 858 So.2d 35, 50.

. Because Defendant does not raise any issue relating to the sufficiency of the evidence with respect to the statutory elements, we do not address the evidence as it relates to each essential element. See State v. Hemy, 13-558 (La.App. 5 Cir. 3/26/14); 138 So.3d 700, 715.

. Griffin testified and confirmed that "Lil Jeff” is Defendant.

. Although Defendant provided an explanation as to how he was familiar with these details, the jury apparently rejected this testimony. When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04); 875 So.2d 949, 955, writ denied, 04 — 1605 (La. 11/15/04); 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. Id.

. As noted by the State, the evidence presented, which allowed the jury to conclude that Defendant shot and killed Smith, served simultaneously to allow the jury to conclude that Defendant intentionally possessed a firearm.

. See La. R.S. 14:30.1; La. R.S. 14:95.1; and La. R.S. 14:26 and 14:130.1(A)(2) and/or (3).

. The record shows that co-defendant McClure used his peremptory challenges to strike prospective jurors Ms. Rankin and Ms. Morris and ultimately exhausted his peremptory challenges. Defendant used one of his four peremptory challenges to strike prospective juror Ms. Britson from the jury, and co-defendant Griffin used one of her peremptory challenges to strike Ms. Caminita from the jury. In a joint trial with several defendants, each defendant has his own 12 peremptory challenges to use individually. La. C.C.r.P. art. 799; State v. Nelson, 10-1724 (La.3/13/12); 85 So,3d 21, 37.

.Defendant’s counsel did not expressly join in the objection; however, it was not necessary for him to do so in order to preserve this issue for appeal. Under La.C.Cr.P. art. 842, where a co-defendant objects, the objection is presumed to have been made by all defendants on trial unless the contrary appears.

. As previously noted, each inmate has a PIN, or identification, number that he or she enters when making a call from JPCC, and that all phone calls are recorded.

. Under La. C.E. art. 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, *507 skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”

. See Louisiana Official Revision Comment (b) to La. C.E. art. 701, "This Article follows Federal Rule of Evidence 701 verbatim.”

. The officer testified that the term "gleezy” is a street term for a Glock gun and that the *508 term "40” referred to a .40 caliber semiautomatic gun. Additionally, the detective testified that the term "bagged” meant robbing someone and stealing their stash.

. Generally, the transcript prevails when there is a discrepancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983).

. See State v. Williams, 00-1725 (La. 11/28/01); 800 So.2d 790, 798-99.