STATE OF LOUISIANA

VERSUS

KENDELL ELLIS

NO. 18-KA-463

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 14-6748, DIVISION "M"
HONORABLE HENRY G. SULLIVAN, JR., JUDGE PRESIDING


July 15, 2019


**FREDERICKA HOMBERG WICKER**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Robert A. Chaisson, and John J. Molaison, Jr.


**AFFIRMED; REMANDED WITH INSTRUCTIONS**
   **FHW**
   **RAC**
   **JJM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Paul D. Connick, Jr.
     Terry M. Boudreaux
     Gail D. Schlosser
     Lynn Schiffman
     Zachary P. Popovich

COUNSEL FOR DEFENDANT/APPELLANT,
KENDELL ELLIS
     Lieu T. Vo Clark

**WICKER, J.**

Defendant, Kendell Ellis, appeals his convictions for second degree murder, attempted second degree murder, and conspiracy to commit armed robbery. For the following reasons, we find both of defendant's assignments of error to be without merit and therefore affirm his convictions and sentences. Finding an error patent, we remand this matter to the District Court for correction of the uniform commitment order and minute entry to conform with the transcript.

FACTS AND PROCEDURAL HISTORY

At approximately 8:42 p.m. on October 23, 2014, Lakeisha Pierre heard gunshots outside of her sister's residence at 1101 DiMarco Street in Marrero, Louisiana. A man, later learned to be Anderson Massey, ran in her direction and fell face first onto the ground. The deceased's Pontiac G6 and a small dark four-door car took off towards the Westbank Expressway. Ms. Pierre discovered her eight-year-old niece, A.T., who had been playing outside with her four-year-old cousin, had been shot in her backside, and Ms. Pierre lay on the ground comforting her until the EMS arrived to take her to University Hospital.[1][2]

Deputy Dominick Henry of the Jefferson Parish Sheriff's Office (JPSO) was dispatched to the location and found Mr. Massey with multiple gunshot wounds lying face down on a driveway between two vehicles. JPSO Homicide Detective Jean Lincoln interviewed the witnesses, A.T., Ms. Pierre, and David Bailey. Mr. Bailey was the only witness to see the shooter chasing the victim with a gun, but he did not know or recognize him.

JPSO found six fired cartridge casings and a copper projectile at the scene. Dr. Marianna Eserman, an expert in the field of forensic pathology,

---

[1] A.T.'s initials are being used under the authority of La. R.S. 46:1844(W)(3), which allows this Court to identify a crime victim who is a minor by using his or her initials.
[2] A.T. was treated for a collapsed lung and fractured rib and scapula from a gunshot wound to her shoulder. She survived her injuries.

18-KA-463                                     1

performed an autopsy on Mr. Massey the next day. She testified that the cause of death was a gunshot wound to the chest, and that the manner of death was homicide. Mr. Massey also had a gunshot wound to the abdomen, entering through the right lower back, and a graze gunshot wound of the hand.

Detectives searched Mr. Massey's apartment at 1109 DiMarco and found over $1,100 in cash, a semiautomatic pistol, an assault rifle, marijuana, pills, and scales. The victim's two cellular phones were not recovered, but the records were requested from Verizon and T-Mobile.[3] The victim's vehicle was located the next day in Algiers using its GPS tracking device. It was recovered at an apartment complex at 3300 Garden Oaks where it appeared to have been recently cleaned on the outside and ransacked on the inside. Detectives obtained a warrant to search the victim's car. Upon searching the vehicle they found that the carpets and paneling had been removed from the car. Crime Scene Investigator Peter Nguyen dusted the vehicle for latent prints and collected DNA samples from the interior door handle, gearshift, and steering wheel.

Detective Lincoln obtained video surveillance taken on the night of the murder from Gold Star Pawn, New Orleans Original Daiquiris on Lapalco, and a business called NOLA LED on Westwood, all located near the murder scene. Detective Lincoln testified that they had no suspects after viewing the videos and that the first time a witness came forward was Jonathan Emilien on November 10, 2014. In October of 2014, Mr. Emilien had been assisting narcotics detectives on an unrelated case. They asked him if he knew anything about the DiMarco shooting, and he answered negatively.

Mr. Emilien was later incarcerated in the Jefferson Parish Correctional

---

[3] Throughout the remainder of this opinion, reference to the victim will be to Mr. Massey, though there was an eight-year-old victim as well.

Center (JPCC) in November of 2014, in the same annex or tier as defendant, someone that he had known since 2001. He testified that while he and defendant were talking one day, Mr. Emilien brought up an incident that he had heard about of somebody being shot and killed on DiMarco. In response, defendant said that it was "his work." Mr. Emilien testified that after the lights went out in the dorm, while they were sleeping in nearby beds, defendant told him that he was there with C.J. (the victim), that "they" tried to rob him, and that shots were exchanged. Mr. Emilien had known the victim from the neighborhood as a drug dealer, but did not know him well. Defendant told him that he called the victim about buying marijuana and that they were supposed to meet at the daiquiri shop on Lapalco in Marrero. When the victim did not show up, defendant and "J" went to DiMarco. Mr. Emilien stated that he later learned that "J" was Jarred Simmons.

Mr. Emilien testified that defendant told him that when they saw the victim in his vehicle driving on DiMarco, defendant called the victim's cell phone, saw the phone light up in the victim's car, and therefore, knew that it was Mr. Massey. Mr. Emilien explained that defendant had the victim's phone number because a third party had previously called victim's phone number on either the defendant's or Mr. Simmons's telephone. When defendant and Mr. Simmons got to the victim's apartment on DiMarco, they exited their vehicle and approached the victim from behind as he was trying to put his key into the door of his residence. When the victim resisted, defendant shot him. Defendant told Mr. Emilien the victim tried to run away after the first shot. Defendant also told him that he and Mr. Simmons had guns and that defendant's gun was a Smith and Wesson 9 mm. Mr. Emilien also testified that defendant said that he and Mr. Simmons then went into the victim's apartment and took marijuana and $1,700. Defendant told him that he and Mr. Simmons were the last people to call the

victim before the murder.

Defendant also told him that one of them drove off in a white Charger that belonged to defendant's girlfriend Beldina Walker, and the other one took the victim's car from the scene before the police arrived. Mr. Emilien recalled that defendant told him his girlfriend lived in the apartments behind the Auto Zone on Manhattan. Mr. Emilien testified that after he got this information, he asked to speak to a detective. He maintained that he came forward because he felt badly about the young girl who was shot. Mr. Emilien testified that at the time he spoke to the detectives, he had not seen police reports, newspaper articles, or nola.com articles about the DiMarco shooting; he maintained that he got his information from defendant.

Mr. Emilien testified that four or five days after his first meeting with detectives, he requested a second meeting with them as he had gotten more information from defendant. Defendant believed that "Josh" must have told the police about his involvement in the DiMarco shooting. Mr. Emilien explained that when he clarified with defendant that "Josh" was from Lincolnshire with "dreads," he realized it was Joshua Jernigan whom he knew well. Mr. Emilion understood Mr. Jernigan to be the person who gave defendant the victim's phone number. Additionally, in December of 2014, Jarred Simmons came to his cell, trying to intimidate him, and said that word was circulating that Mr. Emilien had gone to detectives about the DiMarco situation. Mr. Emilien told Mr. Simmons that he was not admitting to it. He stated that days later, Mr. Simmons came back to his cell and told him that it was his "work" on DiMarco, that he shot the victim, and that defendant was just present at the time. Mr. Emilien recalled writing a letter to Detective Morris in January of 2015, about that talk, explaining that he was feeling concern for his safety after his interaction with Mr. Simmons and that he had asked the prison personnel to keep

him separated from Mr. Simmons and defendant, but they did not.

Mr. Emilien admitted that he was a drug dealer. He explained that at the time he spoke to the detectives, he was facing charges for possession of heroin. He insisted that the detectives did not promise him that they were going to give him a plea deal or leniency but that they would inform the district attorney of his cooperation. He stated that he was facing ten years in prison, and that in April of 2016, he got a plea deal from the State wherein he would serve four years for possession of heroin and three years for resisting an officer. Mr. Emilien testified that he pled guilty to those charges and served his time. Mr. Emilien testified while incarcerated in Atlanta for armed robbery, aggravated assault, and false imprisonment, but testified that no one from Jefferson Parish District Attorney's Office or Sheriff's Office had offered him assistance on those charges. He also testified to prior convictions for felon in possession of a firearm, aggravated battery, second degree battery, possession of heroin, and possession of a controlled dangerous substance.

Mr. Emilien also wrote a letter on behalf of defendant in August of 2015, at the insistence of defendant. The letter was for defendant's attorney expressing his intent to not cooperate with the State and with questions for the defense attorney to ask Mr. Emilien. Defendant instructed Mr. Emilien regarding the answers defendant wanted him to provide. Mr. Emilien testified that defendant did not want him to testify at trial. He stated that defendant wanted him to say that he heard the information regarding the DiMarco shooting through the grapevine from third persons, and that he went to detectives to try to get a deal for a reduction in sentencing on his heroin charge.

Joshua Jernigan testified that on October 23, 2014, at 8:00 p.m., he was in the Lincolnshire subdivision in Marrero with Ethan Allan. He recalled seeing Mr. Simmons, whom he knew from the neighborhood, and another person in a

car whom he could not identify. They pulled up to him, and Mr. Simmons asked him who did his tattoos. Mr. Jernigan testified that he provided three names to Mr. Simmons, including "C.J.," the victim. Mr. Jernigan called a friend who gave him the victim's phone number. Afterward, he called the victim from his phone. Mr. Jernigan asked the victim if he was "doing tattoos" that night, and asked the victim where they could meet. The victim told them to meet him at the daiquiri shop on Lapalco. Mr. Jernigan testified that they subsequently went to that daiquiri shop. He got out of his car and got into the car with Mr. Simmons. The victim did not show up. Mr. Jernigan stated that he did not go to the victim's house.

Mr. Jernigan testified that he recalled giving a statement to the police in February of 2015, but it was not the truth and that he was telling the truth at trial. Mr. Jernigan recalled telling police that Mr. Simmons and the other person asked him to set them up with somebody to buy marijuana. Mr. Jernigan recalled telling the police that the other person with Mr. Simmons said that the real plan was to rob or "jack" the victim. He claimed that he did not know anything about the instant case other than what the detectives told him about defendant's charges. Mr. Jernigan testified that he had felony and misdemeanor convictions for possession of marijuana, and contributing to the delinquency of a minor, possession of a legend drug, simple robbery, and domestic abuse.

Jarred Simmons testified while still facing his own murder charges in the instant case. He testified that defendant was his cousin. Mr. Simmons testified that on October 23, 2014, he asked Mr. Jernigan to put him in contact with someone to sell him marijuana and that Mr. Jernigan called the victim and set up a meeting at the daiquiri shop on Lapalco. The victim did not show up so Mr. Jernigan called the victim who told them to meet him on DiMarco Street. He

stated that Mr. Jernigan got back in the car with Mr. Allan and left. Mr. Simmons testified that he went to DiMarco Street in defendant's girlfriend's car, but he was with "Popeye," whose real name was "James Bond."

Mr. Simmons stated that he knew the victim from around the neighborhood and that they were "cool." Mr. Simmons testified that he called the victim from defendant's phone and was told to meet him on DiMarco. Mr. Simmons got in the car with the victim to conduct the transaction. Mr. Simmons stated that he heard shots. He asserted that he ran, jumped back into Ms. Walker's car, a black, four-door Suzuki, and left the scene. He also claimed that "Popeye" was the person who shot the victim, but he only saw the flash and the victim running. He testified that "Popeye" was not in Ms. Walker's car, but "they" took the victim's car. Mr. Simmons later went to Garden Oaks Apartments where his friend lived, and "Popeye" was already there.

He recalled speaking to the police on December 15, 2014, after being arrested on an unrelated charge for aggravated flight. He stated that when he was arrested, he asked to speak to the detectives about the DiMarco shooting. Mr. Simmons recalled that Detective Lincoln told him she could not offer him a plea deal for the unrelated charge. He admitted to initially telling police that defendant was driving Ms. Walker's car and defendant called the victim. Mr. Simmons recalled giving a second statement to the police in February of 2015. He also recalled telling the police that while he, defendant, and Mr. Jernigan were sitting at the daiquiri ship, defendant said that they were going to "jack" the victim and that Mr. Jernigan left afterwards. He recalled telling the police he saw the victim get shot. Mr. Simmons testified that he remembered telling the police in 2014 and in 2015, how he and defendant fled from the murder scene, that after defendant shot the victim and the girl, defendant took Ms. Walker's keys, gave them to him, and told him to leave. He recalled telling the police that defendant

jumped into the victim's car and left before he did. He recalls telling police that he met up with defendant at Garden Oaks Apartments in Algiers.

Mr. Simmons also testified that he had prior convictions for simple robbery, possession with intent to distribute marijuana, and possession of false drugs. He asserted that he wrote affidavits or letters from jail. He stated that in February of 2015, he wrote that he wanted to take back his statements that he made about defendant and that he did not want to testify against defendant as he was in "great fear for his life." In another letter in March or May of 2015, he stated that he did not want to testify or be a witness against defendant. Mr. Simmons stated that he said in that letter that he was led in his testimony and promised by detectives that his charges would be dismissed for his cooperation and that since detectives did not uphold their promise, he was no longer willing to cooperate. He recalled writing another letter in September of 2016, sent to the district attorney's office, stating that the detectives did not live up to their bargain, that he was not willing to testify, and that he only placed defendant on the scene because he wanted to get out of jail.

Detective Lincoln testified as to her work after speaking with Mr. Emilion. By listening to jailhouse calls, Detective Lincoln was also able to confirm that defendant's girlfriend was Ms. Walker and that she lived at 1625 Apache, off Manhattan. On November 13, 2014, she obtained a search warrant for Ms. Walker's apartment and she seized defendant's cell phone and Ms. Walker's cell phone. Detective Lincoln learned that Ms. Walker drove a 2005 Suzuki Forenza black, four-door car that matched the description given by the eyewitness, Ms. Pierre. She attempted to speak to Mr. Jernigan; however, he refused. On December 15, 2014, Detective Lincoln spoke to Mr. Simmons who told her he was scared to come forward as defendant knew people who would come after him.

Detective Lincoln testified that at 8:07 p.m., within forty-five minutes or so before the homicide, the Jefferson Parish license plate recognition system indicated that Ms. Walker's car passed that system going into the neighborhood a street down from where Mr. Jernigan lived. She also confirmed, from the daiquiri shop video, that Ms. Walker's car went to the daiquiri shop that evening at 8:24 p.m. Detective Lincoln testified that the video confirmed that Mr. Jernigan exited Mr. Allan's white vehicle, and got into Ms. Walker's black vehicle.

Detective Lincoln explained that the path to DiMarco Street taken by Ms. Walker's vehicle was captured in the NOLA LED surveillance video, which showed that the car was on the corner of 8th and Westwood, near the victim's residence, at 8:38 p.m. and that it turned onto 8th Street. She stated that the video showed the victim's Pontiac being followed by Ms. Walker's Suzuki. The Gold Star Pawn video of the Westbank Expressway confirmed that at 8:42 p.m., the first car speeding away from the scene was the victim's car followed by the Suzuki, and both turned onto the expressway.

Detective Lincoln asserted that the phone records indicated that on October 23, 2014, at 8:38 p.m., defendant's phone placed two calls to the victim's phone and that the victim's phone did not receive any other calls between 8:38 p.m. and 8:43 p.m. when the victim was killed. JPSO Detective Donald Zanotelli testified that he analyzed cell phone records for the victim's and defendant's cell phones. He also testified that he did not know if the phone attributed to defendant was registered in defendant's name.

Detective Lincoln also testified that she applied for search warrants to obtain DNA from defendant and Mr. Simmons, after which she collected their samples. At trial, David Cox, an expert in the field of forensic DNA analysis with the JPSO, testified that the steering wheel of the victim's vehicle had a

mixture of DNA from multiple people, which made the interpretation complicated. However, he explained that 78.2 percent of defendant's "alleles" were present in the DNA mixture on the steering wheel. The JPSO lab requires 82 percent for a conclusive determination of DNA contribution so he recommended that the samples be sent to an outside lab capable of more advanced calculations with software. Mr. Simmons' DNA was not found inside the victim's vehicle.[4]

William Allan, a casework supervisor at Cybergenetics, testified as an expert in the field of DNA Evidence Interpretation. His company created TrueAllele software, a computer program that takes electronic DNA data and separates contributors to DNA. He received electronic DNA evidence from a swabbing of the steering wheel from the victim's vehicle in the instant case. He testified that there were at least three or four contributors to the DNA on the steering wheel. He also testified that a match between the steering wheel and defendant was two times more probable than coincidence at one DNA location and that it was twice as likely that defendant contributed his DNA to that location than a random coincidental person.[5] There was no positive match between the steering wheel and Mr. Simmons.

The murder weapon was eventually recovered in a 2016 traffic stop on Deonte Royal. Detective Lincoln testified there was no evidence that Mr. Royal was connected to the murder. Detective Lincoln testified that there was only

---

[4] Sergeant Jamey Perque of JPSO, an expert in the field of latent print identification and examination, testified that the only print identified was a palm print on the rear driver's side panel of the victim's vehicle, linked to Jarred Simmons.

[5] Williams Allan's testimony and report indicated that a match between the victim's steering wheel and defendant was:

1)  414 times more probable than a coincidental match to an unrelated African-American person;

2)  47.6 thousand times more probable than a coincidental match to an unrelated Caucasian person; and

3)  21.3 thousand times more probable than a coincidental match to an unrelated Hispanic person.

evidence of one weapon being used on the scene.  Jene Rauch, JPSO crime lab firearm and tool mark section supervisor, testified as an expert in the field of firearm identification, examination, and analysis.  She testified that the gun recovered in a traffic stop in 2016 matched the projectile and the casings found on the scene.

The defense called Dewanna Buckley, defendant's mother.  She testified that after a conversation with Mr. Simmons, she did not believe that defendant committed the homicide.  Ms. Buckley asserted that she discussed the matter with Mr. Simmons several times and that each of those times she was completely convinced of defendant's innocence.

Tariska Ellis, defendant's sister, testified that she discussed this case with Mr. Simmons at her house while her mother and her child's father were present.  Ms. Ellis knew who "Popeye" was and that he was dead.  She went to Mr. Jernigan's house to find out what happened on DiMarco, but she did not find out.  Ms. Ellis testified that she has seen Mr. Simmons with her brother's cell phone; she did not recall the phone number for that phone.

Finally, Latasha Dabney testified that defendant was her nephew and that Mr. Simmons was his cousin.  She further testified that she had seen Mr. Simmons in a dark "G6" car with rims around September or October of 2014, possibly on the date of the murder.  Ms. Dabney asserted that she met with Mr. Simmons while he was retrieving a cell phone from her at her home in Woodmere, off Lapalco.

DISCUSSION

Defendant argues that the evidence was insufficient to support his convictions and that the trial court erred for that reason in denying his motion for

a new trial.[6] He contends that the only evidence that directly implicated him was the testimony of Mr. Emilien, who obtained a favorable deal in his criminal case in return for his testimony, and the prior statements of an indicted co-conspirator, Mr. Simmons, who recanted those statements under oath in court. Defendant asserts that Mr. Emilien's information was proved to be incorrect in several respects, including that no evidence was discovered that anyone entered the victim's home that night, that any shots were fired inside the home, that there were no drugs or cash left behind in the victim's vehicle, and that a black car, rather than a white car, was driving to the scene of the shooting. As such, defendant argues that the evidence is insufficient to support the convictions and sentences, and therefore, the convictions should be reversed.

On February 8, 2018, defendant filed a Motion for New Trial arguing that the verdict was contrary to the law and the evidence and that the ends of justice would be served by the granting of a new trial. Defendant argued that co-defendant, Mr. Simmons, the only eyewitness to the crimes, testified under oath that it was him and his friend, "Popeye," who committed these crimes. He noted that Mr. Simmons admitted to lying to the police about defendant's involvement in the crimes and that Mr. Simmons wrote three affidavits alluding to the fact that he wanted to take back his statements against defendant.

On February 20, 2018, at the hearing on the motion, defense counsel argued that defendant was not present for the offenses but that the jury chose to believe the statement made to the police officer, which was not under oath, rather than Mr. Simmons' testimony that defendant was not the perpetrator. As such, defense counsel asked the trial court to consider granting defendant a new trial. The State responded that the jury based their decision on all of the testimony and

---

[6] The assignments are addressed together because they are related and because defendant discusses them together in his brief.

other evidence, including statements made to the police and to other witnesses. As such, the State asked the trial court to deny the motion. Afterward, the trial court denied the motion stating that it had heard the arguments and reviewed the motion for new trial memorandum, all of the other pleadings, and the entire record. Defense counsel noted her objection.

The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. With regard to the motion for new trial, this Court has recognized that the denial of a motion for new trial based on the verdict being contrary to the law and evidence is not subject to review on appeal; however, both the Louisiana Supreme Court and this Court have still addressed sufficiency claims under these circumstances. *State v. Bazley*, 09-358 (La. App. 5 Cir. 1/11/11), 60 So.3d 7, 18-19, *writ denied*, 11-282 (La. 6/17/11), 63 So.3d 1039.

In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Neal*, 00-0674 (La. 6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

In cases involving circumstantial evidence, the trial court must instruct the jury that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable

that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Mitchell*, 99-3342 (La. 10/17/00), 772 So.2d 78, 83; *State v. Washington*, 03-1135 (La. App. 5 Cir. 1/27/04), 866 So.2d 973, 977.

On appeal, defendant does not argue the State failed to prove the elements of the offenses but rather challenges the State's failure to prove his identity as the perpetrator. Because defendant does not raise any arguments relating to the sufficiency of the evidence with respect to the statutory elements, we need not address the evidence as it relates to each essential element. *See State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 500, *writ denied*, 15-685 (La. 2/26/16), 187 So.3d 468. Nevertheless, a review of the record under *State v. Raymo*, 419 So.2d 858, 861 (La. 1982), reflects that the State presented sufficient evidence under the *Jackson* standard to establish the essential statutory elements of the crimes for which defendant was convicted: second degree murder, attempted second degree murder, and conspiracy to commit armed robbery.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. *State v. Ray*, 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, *writ denied*, 13-1115 (La. 10/25/13), 124 So.3d 1096. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *Id.*

In the instant case, Mr. Emilien testified that while he was incarcerated in the JPCC for unrelated charges, defendant, whom he had known since 2001, confessed to him his involvement in the homicide. Mr. Emilien noted that he had not seen police reports, newspaper articles, or nola.com stories about the shooting, and Detective Lincoln testified that defendant's name was not in those reports or articles. According to Mr. Emilien, defendant told him that he and his cousin, Mr. Simmons, set up a drug deal with the victim and intended to rob him;

that defendant and Mr. Simmons went in defendant's girlfriend's car to meet the victim at the daiquiri shop on Lapalco in Marrero, but the victim never showed up; that defendant and Mr. Simmons went to DiMarco Street where the victim lived; that defendant called the victim's cell phone and saw it light up so they knew that was the victim in the car; that when they got to the apartment on DiMarco, they got out of the car and approached the victim; that the victim resisted, so defendant shot him; and that the victim tried to run away after the first shot.

Mr. Emilien also testified that defendant told him that he and Mr. Simmons went inside the victim's apartment and took marijuana and cash; that defendant and Mr. Simmons were the last people to call the victim before the murder; that one of them drove defendant's girlfriend's car, and the other one drove the victim's car away from the scene after the shooting; and that defendant's girlfriend was Ms. Walker who lived behind the Auto Zone on Manhattan. Mr. Emilien further testified that defendant told him that it had to be Mr. Jernigan who told the police about his involvement in the shooting. He stated that while he was incarcerated at the JPCC, he and Mr. Simmons also had conversations about the shooting on DiMarco. Mr. Emilien asserted that Mr. Simmons told him that was his "work" on DiMarco, that defendant did not commit that crime, and that defendant was present, but Mr. Simmons pulled the trigger. Although Mr. Simmons initially told the police that defendant shot the victim, he recanted his prior statements at trial.

Physical and testimonial evidence was presented that confirmed material points of Emilien's testimony as to what defendant told him, and there was evidence that confirmed defendant's connection to the crime. Detective Lincoln confirmed that defendant and Mr. Emilien were housed in the same annex at JPCC in early November. Mr. Emilien also gave the police the names of Mr.

Jernigan and Mr. Simmons, who later admitted their involvement in this incident. The type of gun which Mr. Emilien stated was used by defendant was also corroborated by the Smith and Wesson linked to the cartridges at the scene.

Mr. Emilien's information about defendant's girlfriend's vehicle being used was also confirmed by detectives. While the type of vehicle was incorrect, the vehicle belonging to the defendant's girlfriend, Beldina Walker, was involved in the offense. The license plate recognition cameras placed the vehicle near Mr. Jernigan's street earlier that evening. Video surveillance linked defendant's girlfriend's vehicle and Mr. Jernigan to the daiquiri shop on Lapalco where Mr. Emilien related that defendant claimed to have been present prior to the offense. Local businesses' surveillance cameras placed the vehicle on streets near the victim's home immediately before and after the shooting.

Mr. Emilien stated that defendant told him he was the last person to call the victim, and phone records showed that a phone call from a phone attributed to defendant was placed to the victim minutes before the shooting. Mr. Emilien related that defendant drove off in the victim's car. This was corroborated by the surveillance cameras and the eyewitness testimony. Defendant's connection to the crime was also confirmed by the presence of DNA on the steering wheel of the victim's vehicle which was 414 times more probable to be defendant's than a coincidental match to an unrelated African-American person.

With respect to Mr. Emilien's information that was not corroborated, Detective Lincoln testified that confessors do not always state every single detail exactly as it happened, which was not unusual. Additionally, Detective Lincoln asserted that no one ever came to her and said that "Popeye" was the shooter.

Although defendant argues that the testimony of Mr. Emilien was not credible because some of his information was not corroborated and because he was given a plea deal, the jury heard the details of Mr. Emilien's plea deal and

his criminal history and obviously found him to be credible. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. In light of the foregoing, a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to prove that defendant was the perpetrator of the offenses and that the State negated any reasonable probability of misidentification. Because we find the evidence was sufficient, we find defendant's assignments of error to be without merit.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).

The transcript reflects that the trial court sentenced defendant to serve life in prison on count one, fifty years on count two, and forty-nine and one-half years on count three, with each of the three sentences to be served without benefit of parole, probation, or suspension of sentence. However, the sentencing minute entry dated February 20, 2018, reflects: "LIFE of the sentence to be served without benefit of parole, probation, or suspension of sentence." The minute entry does not reflect that the sentences on counts two or three were also to be served with those same restrictions; however, all of the sentences were ordered to run concurrently. The uniform commitment order (UCO) indicates that the amount of time to be served without benefits for each of the three sentences on counts one, two, and three was "LIFE," even though defendant was not sentenced to life on counts two and three. The transcript prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

Accordingly, we remand this matter to the trial court with instructions to correct the sentencing minute entry and the UCO to conform to the transcript. The Clerk of Court for the 24th Judicial District Court is also instructed to transmit the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and to the Department of Corrections' legal department. *See State v. Garcie*, 17-609 (La. App. 5 Cir. 4/11/18), 242 So.3d 1279, 1290.

CONCLUSION

Therefore, for the reasons discussed, defendant's convictions and sentences are affirmed and the matter is remanded to the 24th Judicial District Court for correction of the sentencing minute entry and the uniform commitment order. The Clerk of Court is ordered to transmit the corrected uniform commitment order to the Department of Corrections.

**AFFIRMED; REMANDED WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

MARY E. LEGNON
INTERIM CLERK OF COURT

CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## <u>NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY</u>

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY <u>**JULY 15, 2019**</u> TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

_____
**MARY E. LEGNON**
INTERIM CLERK OF COURT

# 18-KA-463

## <u>E-NOTIFIED</u>
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE HENRY G. SULLIVAN, JR. (DISTRICT JUDGE)
TERRY M. BOUDREAUX (APPELLEE)          LIEU T. VO CLARK (APPELLANT)          GAIL D. SCHLOSSER (APPELLEE)

## <u>MAILED</u>
HON. PAUL D. CONNICK, JR. (APPELLEE)
LYNN SCHIFFMAN (APPELLEE)
ZACHARY P. POPOVICH (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053