PER CURIAM.
I,We granted the state’s application to consider the Fourth Circuit’s split-panel decision reversing defendant’s conviction and sentence for second degree murder in violation of La.R.S. 14:30.1. State v. Mack, 12-0625 (La.App. 4 Cir. 5/10/13) (unpub’d). For the reasons that follow, the court of appeal’s decision is reversed and defendant’s conviction and sentence are reinstated. The case is remanded to the court of appeal to address defendant’s remaining claims of trial error raised below and pre-termitted on original appeal.
A jury convicted defendant as a principal in the murder of Mark Westbrook, victim of an apparently gratuitous two-shot execution committed by Ortiz Jackson on the night of July 10, 2008. Based primarily on the circumstantial evidence provided by cellular phone records from Sprint and Verizon tying the cell numbers of defendant and Jackson together with the number of an “unknown” person, the state argued, and jurors ultimately concluded, that defendant, who had intervened in an argument between Westbrook and Rock McKinney, one the victim’s friends, |2on a night of drinking in Lucky’s Lounge on Chef Menteur Highway at its intersection with Laine Avenue, got on his cell phone and orchestrated Westbrook’s demise, after exchanging words with the intoxicated *985 victim outside of Lucky’s and warning him, “You know, I’m Sam Mack. You know what I could have done to you.”
To place the Sprint and Verizon cellular phone records in the context of the immediate circumstances surrounding the shooting, the state presented the testimony of two eyewitnesses, each of whom positively identified Ortiz Jackson as the shooter, but who also described the series of events leading to the victim’s death. James Bradley, a close acquaintance of the victim and a patron of Lucky’s Lounge that night, testified he arrived at the bar between 8:30 and 9:00 p.m. and had several drinks with the victim. Later, Bradley went outside and was told by Rock McKinney that he, McKinney, had been arguing with West-brook. Bradley encouraged McKinney to speak with the victim, because Bradley knew the two men were friends. McKinney left to walk toward the victim, and defendant followed him, while Bradley, Edwin Nelson (another acquaintance of Bradley’s), and some other individuals walked behind defendant.
Bradley testified that Westbrook turned and asked the group why they were following him and McKinney explained he only wanted to talk to the victim. Bradley overheard the victim say to defendant, “I know what you’re about. I’m about that too,” to which defendant replied, “I ain’t got no beef with you, Lil’ brother.” Bradley then saw defendant begin walking away towards Lucky’s, and while doing so, defendant opened his phone and started dialing or texting. Bradley did not see defendant again.
After about 20 minutes, and the victim had calmed down, all of those remaining decided to leave. Before doing so, the victim and McKinney apologized |sto each other. Another acquaintance, Terekethia Calloway, told the victim he needed to stop drinking so much, and also gave him a hug. Bradley then heard a shot, and turned to see Jackson put a gun to the back of the victim’s head and fire a second shot. The victim fell to the ground, and Jackson calmly walked away.
Bradley testified defendant did not know any of his acquaintances, and did not become involved with anyone until defendant interjected himself into the argument between McKinney and the victim. Bradley initially said he did not hear all of the words exchanged between defendant and victim, but knew the victim was being “hotheaded.” Bradley also did not initially tell police he saw defendant use his phone immediately after his exchange of words with the victim.
Edwin Nelson, a lifelong friend of both Bradley and the victim, testified he knew McKinney and Calloway from the neighborhood. He also was familiar with Jackson and defendant, and had seen them together “a couple of times.” Nelson testified he saw the victim and McKinney get into an argument over a woman. Though the argument was heated, there was no physical interaction. The victim left the bar, and Nelson, McKinney, Bradley, and defendant followed him outside. Nelson testified that at some point, defendant interjected himself into the argument. Nelson heard defendant say, “You know, I’m Sam Mack. You know what I could have done to you.” Defendant also made threatening gestures of an unspecified nature. Nelson testified that after defendant admonished the victim, he stepped back, retrieved a cell phone, and began dialing or texting. Defendant walked away and Nelson, like Bradley, did not see him again that evening.
Nelson’s description of the events that followed tracked that of Bradley.' McKinney and the victim made up and were preparing to leave. Nelson saw Jackson walk up to the victim and shoot him twice. *986 Nelson, who had been sitting nearby in his car, sped off. Later, Nelson identified defendant as the naan who had | /threatened” the victim. He, like Bradley, said in his initial statement to police defendant was attempting to break up the conflict between the victim and McKinney. Nelson claimed he did not initially mention to police that defendant had threatened the victim. Nelson stated he was not thinking clearly during his first statement when he said defendant was there to stop the fight, or that the victim was the one who had threatening words with defendant. Nelson also neglected to mention to police during his initial statement defendant’s cell phone use 30-45 minutes before the shooting. Nelson did not recall defendant making the comment to the victim that “I ain’t got no beef with you brother.”
Nelson informed police of the threats he heard defendant make when presented with the photo array in which he identified Jackson as the shooter. Nelson told police then that, “Sam Mack butted into the argument and he threatened [the victim].” Nelson was of the opinion that defendant was “like back-up” for McKinney, though he did not think McKinney and defendant were actually going to fight the victim. In Nelson’s view, defendant first spoke with McKinney, prompting a response from the victim. Nelson testified he felt defendant did not go outside with the intention of being a peacemaker, and that after the conversation between defendant and the victim became heated, defendant informed Westbrook, “You know who I am. You know what I can have done to you.” The conversation only lasted “two or three minutes.” Nelson also testified he was unaware of any conflict between defendant and the victim while everyone was still in the bar.
New Orleans Police Officer Detective Kevin Burns investigated the homicide and testified at trial. In his initial interviews with witnesses, Burns learned defendant had made threats to the victim, specifically, “Do you know who the fuck I am,” and “What I can have done to you.” Bradley and Nelson identified the shooter as Jackson, who was later arrested and found to be in possession of the |smurder weapon and a cell phone. Jackson’s cell phone had defendant’s number saved in it.
Officer Burns conceded during cross-examination that Bradley had said nothing in his recorded statement about threatening comments made by defendant, but testified that he must have inadvertently attributed to Bradley Nelson’s later statement regarding a threat. Burns also conceded Nelson told him that defendant was attempting to break up the fight, and that the victim exchanged words with the defendant as a result. Burns confirmed that Nelson said after the argument between defendant and the victim, defendant stepped back, made a call, began speaking with someone, and left. In contrast, Burns testified Bradley told him defendant merely dialed a number before leaving. Burns indicated Ronald Ruffin, the other occupant of the car Nelson drove away in, had identified defendant, instead of Jackson, as the shooter in a photo line-up. According to the detective, Ruffin informed him that as he drove away from the scene with Nelson, Westbook called him “and said that Sam Mack was trying to kill him.” Burns emphasized that Ruf-fin did not claim to have witnessed the shooting but “made the identification solely on what he was told by the victim minutes before he was killed.”
On re-direct, Burns confirmed that in his report he stated Bradley said defendant made the statements, “Do you know who the fuck I am,” and “Do you know what the fuck I can do to you?” Burns clarified, however, that the report of the *987 threatening statements could have been made by either Nelson or Bradley, but that they were given to him by a witness on the night of the murder.
The state presented the cellular records of phone calls made between defendant, “Unknown,” and Jackson. The first, 504-307-0046 (“unknown”) belonged to an unidentified subscriber. The second, 504-377-3431 (“Jackson”) 1 ^belonged to the shooter, Ortiz Jackson. Finally, 504-220-6855 (“Defendant”) was shown to belong to defendant. Phone records pertaining to those three numbers covering the period between July 5, 2008 and July 14, 2008 were entered into evidence and were at the heart of the state’s case. The order of phone calls placed around the time of the murder was as follows:
21:13:57: unknown calls defendant (30 seconds)
22:09:10: unknown calls defendant (5 seconds)
22:09:22: unknown calls defendant (89 seconds)
22:55:20: unknown calls defendant (73 seconds)
23:31:26: defendant calls unknown (26 seconds)
23:32:22: unknown calls defendant (27 seconds)
23:33:13: unknown calls Jackson (118 seconds)
23:36.27: Jackson calls defendant voice mail (16 seconds)
, 23:36:53: Jackson calls defendant (22 seconds)
23:54: Officers dispatched to the scene of the shooting.
23:58:33: Jackson calls ■ defendant (41 seconds)
00:00:05: defendant calls Jackson (14 seconds)
00:01:28: Jackson calls defendant (148 seconds)
00:05:55: Jackson calls defendant (29 seconds)
00:06:29: unknown calls defendant’s voice mail (29 seconds)
00:07:21: Jackson calls defendant (168 seconds)
00:14:21: Jackson calls defendant (128 seconds)
00:23:45: Jackson calls defendant (22 seconds)
00:24:30: Jackson calls defendant (70 seconds)
00:26:08: Jackson calls defendant (518 seconds)
02:40:01: defendant calls unknown (88 seconds)
The documentary evidence thus revealed that a total of 12 calls took place between defendant and Jackson in the hours before and after the shooting. The state also presented ample evidence of numerous phone calls between defendant and Jackson in the days before and after the shooting, in addition to calls between Jackson and “Unknown.”
On appeal, the Fourth Circuit addressed the state’s contention that defendant threatened the victim, was seen using- a cell phone, and that the victim died shortly after a series of phone calls between defendant, an unknown person, and Jackson. Defendant argued because the state could not prove the content of the phone calls 17made -to Jackson and the unknown party before the shooting, the state could not satisfy its burden of proof regarding any specific intent to murder the ■ victim. Finding the state’s case rested wholly on circumstantial evidence, the majority reasoned that, given Sprint and Verizon records indicating that calls linking the cell numbers of defendant’s, Jackson’s, and “unknown’s” phones on July 9, 2008 and in the hours well before the late-evening *988 murder of Westbrook at Lucky’s, “the State did not exclude that another logical inference, other than to procure murder, could be drawn from these telephone calls; namely, that the defendant may have been returning the phone call of the unknown caller and/or that these calls were to discuss the business that pre-existed among them prior to defendant’s interjection of himself into the altercation between the victim and Rock McKinney.” Mack, 12-0625 at 19. The majority felt compelled to reach that conclusion because the state had failed to produce any evidence that:
(1) Defined the relationship among defendant, the unknown caller, and Jackson, so as to explain why Jackson would shoot the victim at defendant’s be[hest]; (2) failed to identify the unknown caller so as to clarify why he would act as an intermediary between Jackson and defendant in arranging the victim’s murder; (3) failed to show that defendant made any direct calls to Jackson to procure the victim’s murder; and (4) most importantly, failed to document the substance of any conversation among defendant, Jackson, and the unknown caller. Id.
Dissenting, Judge Lobrano noted “what would be an extraordinary coincidence if it was not all interrelated — Ortiz Jackson’s otherwise unexplained arrival on the scene within twenty minutes of the last phone call between the two cell phones and his otherwise unexplained brutal execution of the victim within that same twenty minute period.”- Mack, 12-0626 at 1 (Lobrano, J., dissenting). Unwilling to subscribe to that extraordinary coincidence, Judge Lo-brano concluded that “[vjiewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant 18communicated with Ortiz Jackson with the specific intent to procure Ortiz Jackson to shoot the victim and to kill or inflict great bodily harm upon him.” Id.
We agree with Judge Lobrano. Underlying the controversy between the state and defendant in the present case is the question of how much deference a reviewing court in Louisiana must give to the jury’s verdict in a ease involving primarily or exclusively circumstantial evidence. In Wright v. West, 505 U.S. 277, 296, 112 S.Ct. 2482, 2492, 120 L.Ed.2d 225 (1992), the Supreme Court emphasized just how narrowly the Court intended its seminal decision in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) to apply:
In Jackson, we emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review. We said that ‘all of the evidence is to be considered in the light most favorable to the prosecution,’ 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in the original); that the prosecution need not affirmatively ‘rule out every hypothesis except that of guilt,’ id., at 326, 99 S.Ct. at 2792; and that a reviewing court ‘faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution,’ ibid.
When this Court first implemented the Jackson standard, we indicated at one time that Louisiana’s traditional rule with respect to circumstantial evidence as incorporated into La.R.S. 15:438, that the evidence must negate every reasonable hypothesis of innocence, might change the terms of analysis and even add a second level of review. See e.g., State v. Shapiro, 431 So.2d 372, 388 (La.1982) (on reh’g) *989 (“Assuming without deciding that the due process clause of the federal constitution as espoused in Jackson v. Virginia is not offended by a state conviction supported-by the identical evidence in this record, that constitutional consideration is irrelevant to our disposition of this case. We are constrained in a case of this sort by Louisiana law of long standing, La.R.S. 15:438, to decide as a matter of law whether every reasonable hypothesis of innocence has been | nexcluded, assuming every fact proven that the evidence tends to prove.”); State v. Williams, 423 So.2d 1048, 1052 (“The Louisiana legislature has, through this statute, provided greater protection against erroneous convictions based on circumstantial evidence than is provided by the Fourteenth Amendment. There is a possibility that the quality of evidence supporting a conviction would satisfy Jackson v. Virginia, [] but would not satisfy the requirement of R.S. 15:438.”). We subsequently clarified, however, that “[ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden.” State v. Wright, 445 So.2d 1198, 1201 (La.1984). Thus, the rule of La.R.S. 15:438 does not supplant Jackson’s objective test of evidentiary sufficiency from the point of view of a hypothetical rational trier of fact, although it does “provide[ ] an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt.” Wright, 445 So.2d at 1201.
To preserve the role of the fact finder, ie., to accord the deference demanded by Jackson, this Court has further subscribed to the general principle in cases involving circumstantial evidence that when the- fact finder at trial reasonably rejects the hypothesis of innocence advanced by the defendant, “that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.” State v. Captville, 448 So.2d 676, 680 (La.1984). A reasonable alternative hypothesis is not one “which could explain the events in an exculpatory fashion,” but one that “is sufficiently reasonable that a rational juror could not ‘have found proof of guilt beyond a reasonable doubt.’ ” Id. (quoting Jackson). Thus, in all cases, the Jackson standard does not provide a reviewing 1 incourt with a vehicle for substituting its appreciation of what the evidence has or has not proved for that of the.fact finder. State v. Pig-ford, 05-0477,-p. 6 (La.2/22/06), 922 So.2d 517, 521; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165, 1166. A reviewing court may impinge on the “fact finder’s discretion ... only to the extent necessary to guarantee the fundamental due process of law.” State v. Mussall, 523 So.2d 1305,1310 (La.1988).
In the present case, the state relied on direct evidence of the threat made by defendant to the victim 20 minutes before Westbrook died and circumstantial evidence offered by the web of cell phone calls among defendant, Ortiz Jackson, and “unknown,” as twin buttresses of its theory that defendant had “concerned” himself in Westbrook’s murder. R.S. 14:24 (“All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.”). Defense counsel, however, asked jurors to consider how defendant, the “peacemaker” in the dispute between Westbrook and Rock McKinney, who then walked away from the confrontation with the belligerent Westbrook after *990 informing the victim he had “no beef’ with him, then became in the state’s theory the “undertaker” in the call placed by Jackson to defendant at 11:36 p.m., less than 30 seconds long, the last call before West-brook’s demise nearly 20 minutes later. It was not reasonable, counsel argued, to believe that defendant could have explained the situation and identified the victim in sufficient detail that Jackson could simply walk up and fire two shots into the intended target approximately 20 minutes later. It was far more reasonable, in counsel’s view, that defendant simply informed Jackson he had intervened in a fight and was walking away from another one, or to suppose that Westbrook may have been killed by some unknown person |n satisfying a grudge by calling Jackson to say Westbrook was “wasted out of his mind, he’s almost defenseless like right now, you can kill him.”
But jurors had heard of defendant’s scarcely veiled threat to Westbrook and had before them the cellular phone records documenting that at 10:55 p.m., “unknown” called defendant and spoke to him for 73 seconds, that defendant then called “unknown” at 11:31 p.m. (26 seconds), “unknown” called defendant back at 11:32 p.m. (27 seconds) and then called Jackson at 11:33 p.m. (118 seconds), after which Jackson then called defendant at- 11:36 (16-second voice mail) and again immediately at 11:36 (22 seconds). Reasonable jurors could rationally find that the three men had sufficient time to discuss the situation, identify the victim, and orchestrate his demise, if they were so inclined, even if jurors were not willing to speculate with the state that defendant may have met personally with Jackson in the 20 minute interval between, their last call and the victim’s murder. The phones had fallen silent in that 20 minute interval but the calls resumed in a flurry within four minutes of Westbrook’s murder.
Jurors therefore had an evidentiary basis for rationally rejecting the primary hypothesis of innocence advanced by the defense and the alternative hypothesis as well, for which there existed absolutely no evidence, that someone else recruited Ortiz Jackson to take advantage of the situation and to murder the intoxicated Westbrook. Those hypotheses therefore failed, and the pertinent question for the court of appeal was thus whether the various alternative hypotheses advanced by defendant on appeal, and in this Court, did not simply offer a possible exculpatory explanation but were so reasonable that rational jurors would necessarily have looked past Judge Lobrano’s “extraordinary coincidence” if all of the calls were not interrelated and found a reasonable doubt of defendant’s guilt. Among those alternatives is the possibility that Jackson and Westbrook had a bitter dispute- of |iatheir own and that Jackson settled the score on that night after receiving word of Westbrook’s whereabouts from defendant, who may have, for all that can ever be known, instructed Jackson not to harm the victim.
The nature of the relationship shared by defendant, Jackson, and “unknown” is not evident from the record but they were clearly entangled in the web of calls 20 minutes before the Westbrook shooting and within four minutes thereafter. It was possible, as defendant argues and as the Fourth Circuit majority came to agree, that Jackson simply called defendant at 11:58 p.m. to continue their conversations earlier that day and in the preceding day, as also documented by the Sprint and Verizon records. But it was undisputed that Jackson killed Westbrook. Jurors heard the same timeline and saw the same listing of the Sprint and Verizon records. They implicitly found that, even if possible, it was not probable that Jackson would call defendant about unrelated matters only *991 four minutes after gunning down the victim in a public place. It was possible that Jackson simply reported that he had settled the score of his own with Westbrook but not probable, given evidence of defendant’s scarcely veiled threat to Westbrook underscoring that he was Sam Mack and capable of orchestrating exactly what would happen 20 minutes later, words which, according to Ronald Ruffin’s statement to Detective Burns, Westbrook understood as a direct threat on his life. The trial court admitted the detective’s testimony in that regard over defense counsel’s objection (urged in an unrecorded bench conference) but review of the sufficiency of the evidence takes into account all of the evidence introduced at trial, inadmissible as well as admissible. State v. Hearold, 603 So.2d 731, 734 (La.1992). Counsel in any event elicited the detective’s testimony on cross-examination that he gave the same interpretation to defendant’s words as Westbrook. “I think it means,” the officer testified, “I would have you killed.” Rational jurors could find from Nelson’s 11stestimony that those words, and not the statement overheard by Bradley, “I ain’t got no beef with you, Lil’ Bro,” were the last defendant spoke to Westbrook before he got on his cell phone and walked away.
In the present case, the state’s theory of the prosecution was consistent overall with the evidence introduced at trial, while the defense hypotheses of innocence appeared comparatively remote and for the most part lacking in any evidentiary basis. According the trier of fact’s resolution of conflicting inferences or hypotheses the deference that we must, and when considered in the light most favorable to the prosecution, the evidence appears sufficient to convince a rational trier of fact beyond a reasonable doubt defendant was “concerned” in Westbrook’s murder. Cf. State v. Anthony, 98-0406, p. 13 (La.4/11/00), 776 So.2d 376, 386 (“[C]on-trary to defendant’s position implying that if he did not pull the trigger, then he cannot be sentenced to death, the State is not required to show that defendant actually pulled the trigger. Instead, to successfully carry its burden, the State must prove that defendant acted in concert with his co-perpetrators, that defendant had the specific intent to kill, and that one of the aggravating elements enumerated in La. Rev.Stat. 14:30 was present.”).
In reaching the contrary conclusion, the Fourth Circuit placed the greatest weight on the state’s failure to prove the content of any of the phone calls and defendant called the court of appeal’s attention to United States v. Galvan, 693 F.2d 417, 419 (5th Cir.1982), for the proposition that standing alone, telephone calls are insufficient to prove the existence of a conspiracy unless the government identifies the participants in the calls and proves the content of the conversations. But in the present case, which involves Louisiana’s law with respect to principals and not federal conspiracy law, the participants in the cell phone calls were clearly identified. While the content of the calls was not proved directly, the calls were 114not the only evidence in the case, given defendant’s threat to Westbrook 20 minutes before he died. Notably, in United States v. Williams, 264 F.3d 561, 574 (5th Cir.2001), in which the government identified the participants in the unrecorded conversations charted in a manner similar to the present case, “[e]vi-dence that telephone calls were made between phones owned by Defendant and other alleged conspirators, at times consistent with the events alleged to be part of the conspiracy, makes the existence of the conspiracy, and Defendant’s participation in it, more likely.” Cf United States v. Powers, 168 F.3d 741, 746 (5th Cir.1999) (court found meritless claim government must not only prove that the calls alleged *992 in wire fraud indictment were made between defendants, but also in those particular conversations they discussed the unlawful activity).
Consequently, the court of appeal erred in vacating defendant’s conviction for second degree murder on the basis the state failed to present evidence sufficient to sustain the conviction. Therefore, the conviction and sentence are reinstated, and the court of appeal is directed to address defendant’s remaining claims on the merits on remand of the case.
COURT OF APPEAL DECISION REVERSED; CONVICTION AND SENTENCE REINSTATED; CASE REMANDED
JOHNSON, Chief Justice, dissents and assigns reasons.