| STATE OF LOUISIANA | * | NO. 2025-KA-0104 |
| VERSUS | * | COURT OF APPEAL |
| PERRY L. BRILEY | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 554-898, SECTION "F"
Honorable Robin D. Pittman, Judge
\* \* \* \* \* \*
**Judge Rachael D. Johnson**
\* \* \* \* \* \*
(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge Rachael D. Johnson)

**LOBRANO, J., CONCURS IN THE RESULTS**

Jason Rogers Williams
DISTRICT ATTORNEY
Brad Scott
ASSISTANT DISTRICT ATTORNEY, CHIEF OF APPEALS
Patricia Amos
ASSISTANT DISTRICT ATTORNEY
619 South White Street
New Orleans, LA 70119

      COUNSEL FOR STATE/APPELLEE

Holli Herrle-Castillo
LOUISIANA APPELLATE PROJECT
P. O. Box 2333
Marrero, LA 70073-2333

      COUNSEL FOR DEFENDANT/APPELLANT

          **AFFIRMED**
          **DECEMBER 19, 2025**

*RDJ*
*RML*

Defendant Perry L. Briley ("Defendant") appeals numerous convictions and sentences, alleging that (i) the evidence at trial was insufficient to support the convictions and (ii) the forty-year sentence for attempted murder and the twenty-year sentences for possession of a firearm by a convicted felon, possession of a firearm by a person convicted of domestic abuse battery, and illegal discharge of a firearm during a crime of violence are excessive. For the reasons discussed below, we affirm Defendant's convictions and sentences.

## PROCEDURAL HISTORY

On July 22, 2022, a bill of indictment was filed charging Defendant with one count of second-degree murder, in violation of La. R.S. 14:30.1; one count of possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1; one count of possession of a firearm by a person convicted of domestic abuse battery, in violation of La. R.S. 14:95.10; eight counts of aggravated assault with a firearm, in violation of La. R.S. 14:37.4; one count of possession of a firearm in a firearm-free zone, in violation of La. R.S. 14:95.2; and one count of illegal discharge of a firearm while in commission of a crime of violence, in violation of La. R.S. 14:94(F). Defendant pled not guilty to each count.

On June 26, 2023, the State amended the count for second-degree murder to attempted second-degree murder upon discovery that the victim died of causes unrelated to the shooting Defendant allegedly committed. Defendant pled not guilty.

A jury trial took place November 13-16, 2023. The twelve-person jury unanimously found Defendant guilty as charged for each count. On January 25, 2024, the Criminal District Court denied Defendant's Motions for New Trial and for Post-Verdict Judgment of Acquittal.

On June 13, 2024, after a sentencing hearing, the Orleans Parish Criminal District Court sentenced Defendant to forty years for attempted second-degree murder; twenty years each for possession of a firearm by a felon, illegal carrying of weapon by a person previously convicted of domestic abuse battery, and discharging of firearm while committing a crime of violence; and five years each for aggravated assault with a firearm and unlawful possession of firearm within 1000 feet of a school campus. The court specified that all sentences would run concurrently and that Defendant would receive credit for time served.

On September 20, 2024, the Orleans Parish Criminal District Court denied Defendant's Motion to Reconsider and Reduce Sentence but granted Defendant's Motion for Appeal. Trial counsel withdrew as counsel of record and appointed the Louisiana Appellate Project as appellate counsel.

**STATEMENT OF FACTS AND RELEVANT TRIAL TESTIMONY**

On May 13, 2021, there were a series of incidents in close proximity both in time and place: at Bridge Middle School ("the School Incident") at about 8:00AM, on Martin Luther King Boulevard ("the MLK Boulevard Incident") at around 8:09AM, and on Josephine Street ("the Josephine Street Incident") at around

8:14AM. Eyewitness testimony and/or surveillance camera footage show that in each incident, the perpetrator's face was covered and he rode a black mountain bike, had a gun covered by a bandana, and wore a distinctive left-hand glove and black-and-white Air Jordans shoes. These similarities led detectives to believe that each incident was perpetrated by the same individual.

Twelve witnesses testified at trial on behalf of the State: (1) Erika Darby, Head of Public Records at the Orleans Parish Communication District, who received 911 calls and wrote up the related Incident Recall reports of the relevant crimes; (2) Officer Lazono Black, who responded to the School Incident and then shortly after was involved in apprehending Defendant; (3) Lamont Hill, son of the attempted second-degree murder victim, Lamont Fletcher; (4) William Logan Crow, Dean at Bridge Middle School on the day of the School Incident; (5) Cortland Henry, Dean at Bridge Middle School on the day of the School Incident; (6) Officer Colby Stewart, who responded to the MLK Boulevard Incident; (7) Officer Gerald Aufdemorte, who responded to the Josephine Street Incident; (8) Officer Rene Benjamin, who was involved in apprehending the suspect; (9) Detective Charles Haw, who helped execute a search at Defendant's girlfriend's house; (10) Paige Adams, a DNA Analyst at the Louisiana State Police Crime Lab; (11) Sean McElrath, the Section Head for the Forensic Firearms Unit for New Orleans Police Department's Crime Lab; and (12) Detective Matthew Bencik, who responded to the MLK Boulevard Incident and helped apprehend and interview Defendant.

The evidence discussed below was introduced through the State's witnesses at trial.

<u>The School Incident</u>

The School Incident occurred around 8:00AM on May 13, 2021. Dean Henry testified that as he monitored the morning drop-off at the school's Freret Street entrance, a man "aggressively" walked past the Dean and the students. The man went to the end of the block, circled back around towards the school, and approached the group of students. He repeated "Y'all not going to school" multiple times. Eventually, a student exchanged words with him. After the student said he wasn't afraid of the man, Dean Henry stepped between the two, told the man that he would handle the student, and ushered the students toward the school. As Dean Henry looked back, he saw the man had a gun in his hand. Although the gun was partially covered by a cloth or bandana, Dean Henry testified that the end of a gun was visible. Dean Crow, who observed this altercation from the second-floor balcony just above the drop-off location, also testified that he observed the muzzle of a gun in the man's right hand, though the body was covered by some sort of cloth.

Dean Henry quickly pushed the students inside as the suspect returned to the corner and rode away on his bike down St. Andrew Street. Dean Crow was able to take a few pictures of the man as he got on his bike and rode down St. Andrew Street toward St. Charles Avenue. Dean Crow then called 911. While speaking with 911, he heard four or five gunshots nearby, and then another set of gunshots a bit further away. Dean Henry likewise heard a round of roughly five gunshots as he rushed to security to order a lock down.

Officer Lazono Black responded to the School Incident. The Deans and students told him that the perpetrator wore dark clothes, had a glove on his left hand, and had a scarf or bandana wrapped around his right. His bike was a black

4

mountain bike with a basket or bag on the front. Lastly, his face was obscured by a scarf or cloth secured with a shoestring. Surveillance camera footage of the scene was played for the jury and corroborated the witnesses' description of the suspect. Neither Dean Henry nor Dean Crow participated in an identification procedure after the day of the School Incident.

The MLK Boulevard Incident

By the time Dean Crow called 911, police were responding to another nearby incident. At 8:09AM, 911 received a call about a perpetrator who shot a homeless man five times in the head near the corner of Martin Luther King Boulevard and South Liberty. Lamont Hill testified that the victim was his father, Lamont Fletcher.

At the scene, Officer Colby Stewart spoke with an eyewitness to the shooting, Marquita Tate; she explained that the shooter was a man who rode a bike and wore black shorts, a black hoodie, and a face covering. The incident recall also reflected that the perpetrator was a black male wearing all black clothing and riding a dark-colored bike. Officer Stewart recovered evidence from the scene, including five .9mm casings.

Detective Matthew Bencik also responded to the MLK Boulevard Incident. He collected surveillance camera footage from the nearby Project Food Store, which showed that the perpetrator wore dark clothes with a face covering, rode up to the victim, and fired at him as he slept on the neutral ground. These videos were played for the jury.

The Josephine Street Incident

At 8:14AM, 911 received a call regarding a perpetrator who shot the front door of 2415 Josephine Street multiple times. These bullets punctured the door and

caused damage to the interior of the home. According to the incident recall, the caller described the perpetrator as a black male wearing black clothing and riding a dark-colored bike with a basket. Officer Gerald Aufdemorte testified that he responded to the incident at 9:22AM and identified photographs of shell casings found outside the residence and bullet fragments found inside. According to Officer Aufdemorte, the resident and her neighbors did not see the perpetrator, but other officers advised him to look for a man on a bike wearing black clothes.

Apprehension of Defendant and Investigation

At 10:38AM, 911 received a call about a man in the street at South Claiborne Avenue and Felicity Street waving and pointing a gun at passing cars. The caller said the man was riding a bike and wearing a cream-colored outfit and head covering. After responding to the earlier incidents, Officer Black and Detective Bencik received a radio transmission about this suspect and began looking for him. Shortly thereafter, they saw an individual who matched the description and followed him. As Officer Aufdemorte was typing up his report on the Josephine Street Incident, he received a radio transmission from Officer Black regarding the suspect and helped set up a perimeter. Soon after, he saw the suspect on Josephine Street and began to follow him. Multiple other officers had joined the pursuit of the suspect and coordinated to corner him.

Detective Bencik activated his lights and siren. The suspect, noticing the police cars at the 2300 block of St. Andrew Street, dismounted his bike and began running on foot down an alley between two houses. One of the houses abutting the alley was abandoned. When Officer Black no longer saw the suspect on foot, he walked between the two houses where he last saw Defendant running. There, he located and recognized the suspect, although he had changed clothes into a white

6

shirt and blue shorts. He shortly thereafter found a basket containing cream-colored clothing that matched the original description from the radio transmission. Officer Black's pursuit of the suspect was captured on his body-worn camera, which was played for the jury.

During the pursuit, Detective Bencik saw the suspect pulling at his waistband as though he was going to dispose of a gun. Officer Rene Benjamin, who helped apprehend the suspect, testified that he found a gun wrapped in a blue bandana in a windowless window pane of the abandoned house as well as shell casings in the alley beside the house. This was captured on his body-worn camera; the footage was played for the jury.

After Defendant was apprehended, Officer Black went inside of the abandoned house where he had attempted to flee. Inside the house were three other individuals, two of whom wore all black outfits. Neither of these men were investigated as the suspect in the three earlier incidents because notwithstanding their clothing, Officer Black testified that they did not otherwise match the description relayed over the radio transmission following the earlier incidents. A search warrant was obtained for the abandoned house and police retrieved the gun and eleven .9 mm casings.

Detective Bencik and Detective Charles Haw brought Defendant to the police station to interview him. Defendant said that he came into possession of the bike and gun after stealing the bike from a gas station. Detective Bencik testified that he reviewed the surveillance video from the gas station and it did not corroborate Defendant's claim.

Detective Bencik then obtained an arrest warrant for Defendant as well as a search warrant for his girlfriend's house, where he had been staying for the four

days prior to May 13, 2021. Detective Haw helped execute the search. He testified that police recovered shoes, a left-hand glove, a black jacket, and a shoestring which matched those worn by the suspect in the surveillance videos. The search was captured on Detective Haw's body-worn camera and played for the jury.

Paige Adams, a DNA analyst, testified at trial about her process of DNA testing the recovered gun and .9 mm casings. The DNA profile of the gun's sight grip slide showed a major and a minor contributor. Ms. Adams explained that a major contributor is one whose DNA is more present in the profile; she could not exclude Defendant as the major contributor. However, the trigger guard of the gun had a mixture of DNA from more than two contributors, so Ms. Adams could not draw a conclusion about the contributors.

Sean McElrath, an expert in tool marking and firearms analysis, testified as to the substance of his reports prepared for this case. He explained that the reference-fired cartridge cases obtained from firing the recovered gun matched .9 mm cartridge cases from 2315 St. Andrew Street (where Defendant was apprehended), the neutral ground at the intersection of South Liberty Street and Martin Luther King Boulevard (where the MLK Boulevard Incident occurred), and near a fence in the backyard of 1813 South Liberty Street (which abutted the alley where Defendant ran before being apprehended). The jacket fragments collected from Lamont Fletcher had the same kind of rifling as the reference-fired cartridge, but there was not enough information to match those fragments to the recovered gun.

Lamont Hill testified that Lamont Fletcher died on April 12, 2022, almost a year after being shot on May 13, 2021.

**DISCUSSION**

On appeal, Defendant raises two assignments of error: (1) the State presented insufficient evidence to convict him, and (2) the sentences imposed are excessive.

<u>Insufficient Evidence to Convict</u>

Defendant argues that the State failed to prove Defendant's identity as the perpetrator and failed to present direct evidence linking Defendant to the crimes. Defendant asserts that none of the State's evidence, whether it be eyewitness testimony or surveillance camera footage, showed the identity of the perpetrator, given that his face was concealed. Thus, only circumstantial evidence linked Defendant to these crimes.

Additionally, Defendant contends that the State failed to exclude reasonable hypotheses of innocence, namely, that Defendant came into possession of the bike and gun when he stole the bike from a gas station.

The standard of review in reviewing a conviction was set forth in *Jackson v. Virginia*: "[t]he relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 307 (1979) (emphasis in original).

This Court has explained that "when circumstantial evidence forms the basis of a conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *State v. Jefferson*, 2023-0520, p. 17 (La. App. 4 Cir. 2/8/24), 401 So. 3d 1, 11 (citing *State v. Shapiro*, 431 So. 2d 372, 378 (La. 1982)).

9

In order to convict solely upon circumstantial evidence, "assuming every fact to be proved that the evidence tends to prove, . . . it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. Put another way, "[t]he reviewer as a matter of law, can affirm the conviction only if the reasonable hypothesis is the one favorable to the state and there is no extant reasonable hypothesis of innocence." *State v. Alexander*, 2023-0540, pp. 10-11 (La. App. 4 Cir. 4/23/24), 401 So. 3d 105, 112 (citing *State v. Green*, 449 So. 2d 141, 144 (La. App. 4 Cir. 1984)). This Court has further clarified:

> "If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty." *See State v. Captville*, 448 So. 2d 676 (La. 1984). "A reasonable alternative hypothesis is not one 'which could explain the events in an exculpatory fashion,' but one that 'is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt." *State v. Mack*, 2013-1311, p. 9 (La. 5/7/14), 144 So. 3d 983, 989 (quoting *State v. Captville*, 448 So. 2d at 680.

*Alexander* at p. 11, 401 So. 3d at 112. In addition, "when the defendant disputes his identification as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." *State v. Young*, 2020-01041, p. 3 (La. 5/13/21), 320 So. 3d 356, 359 (citing *State v. Long*, 408 So. 2d 1221, 1227 (La. 1981)).

Here, the State reasonably rejected Defendant's hypothesis of innocence, *i.e.*, that he came into possession of the bike and gun when he stole it from the gas station. Detective Bencik testified that he reviewed the surveillance video from the gas station and saw neither Defendant nor a bicycle theft. Thus, seeing as Defendant did not present another hypothesis which "creates reasonable doubt," a rational juror could have found proof of guilt beyond a reasonable doubt.

Contrarily, the evidence presented by the State – that the perpetrator in each crime wore the same clothing and rode the same bike, and that each crime was close in time and place – supports the jury's finding that the same man committed all these crimes, *i.e.*, the State's reasonable hypothesis. Seeing as there is no "extant reasonable hypothesis of innocence," circumstantial evidence is sufficient to convict in this case.

The cartridges recovered from the scenes of the various incidents matched the gun found near where Defendant was apprehended. That gun was wrapped in a bandana, which matches the description given by the eyewitnesses and shown by the surveillance cameras. Specific articles of clothing worn by the perpetrator – a left-hand glove with a stripe, black-and-white Air Jordans shoes, and a shoestring to secure a face covering – were recovered from Defendant's girlfriend's house, where he had been staying. Taken together, these pieces of evidence show that the jury was reasonable to accept the State's hypothesis.

In his post-arrest interview, Defendant told Detective Bencik that he could not have committed these crimes because he did not leave his girlfriend's house until 10AM that day to buy food for his children. As proof, Defendant points to the fact that he was in possession of his girlfriend's food stamp card at the time of his arrest. However, Defendant being in possession of a food stamp card on the morning of the crimes does not preclude him from having committed the crimes. This evidence does not invalidate the jury's finding of Defendant's guilt beyond a reasonable doubt.

Defendant points out that no ballistics evidence connected the recovered gun to the casings found at the site of the Josephine Street Incident. However, Detective Bencik explained that this is because casings were not typically tested in

property crimes. Though Defendant was arrested for this crime later than for the School and MLK Boulevard Incidents, the jury reasonably inferred Defendant's guilt based on the incidents' proximity in time and place and the similar perpetrator descriptions.

With respect to the clothing recovered in the search, Defendant posits that the Air Jordans shoes are commonly worn among urban males and that the glove had accumulated dust on it at the time of the search, which proves that Defendant must not have worn it the day of the shooting, as not enough time had accrued for the glove to collect dust. These explanations are merely conjecture and were reasonably rejected by the jury. The fact that other urban males may wear these shoes does not mean that Defendant could not have worn them as the perpetrator of the crimes in question.

Further on this point, Defendant argues that if he were guilty of shooting Lamont Fletcher, the Air Jordans shoes would have blood on them. Lamont Fletcher was found with a pool of blood under his head. However, Detective Bencik viewed photograph evidence from the MLK Incident scene and testified that there was no indication of blood splatter.

Though Defendant disputed his identification as the perpetrator, the State negated a reasonable probability of misidentification. Defendant asked during cross-examination of several officers involved in his apprehension why they did not investigate the other men found in the abandoned house. However, Officer Black explained that despite their clothing, these men did not otherwise match the description of the perpetrator. This fact paired with the clothes recovered from Defendant's girlfriend's house and the DNA evidence from the sight, slide, and grip of the gun negate a reasonable probability of misidentification.

Defendant also contends that the Real-Time Crime Center Camera surveillance video from South Claiborne does not show Defendant pointing a gun at passing cars. However, upon review of the video, Defendant indeed raised his arm and aimed it in the direction of passing cars. Though the graininess of the video makes it difficult to determine whether Defendant was holding a gun, the video evidence paired with the 911 call reporting a man pointing a gun into traffic makes the jury's belief of this fact reasonable.

In sum, the jury was reasonable in its reliance on the State's hypothesis regarding its evidence and in ultimately convicting Defendant as the perpetrator of the incidents.

Excessive Sentences

Defendant also argues that the forty-year sentence for attempted second-degree murder and the maximum twenty-year sentences for possession of a firearm by a convicted felon, possession of a firearm by a person convicted of domestic abuse battery, and illegal discharge of a firearm while in commission of a crime of violence were excessive. Defendant suggests that the sentences did not account for numerous mitigating factors. In sum, Defendant argues that "the sentences are excessive in that they do not serve to complete the acceptable goals of punishment, constitute the purposeful imposition of pain and suffering, and are disproportionate to the severity of the offense committed because they are not tailored to [Defendant] and do not take the mitigating factors into account."

In *State v. Smith*, this Court set forth the standard for evaluating an excessive sentence claim:

> Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that "[n]o *law* shall subject any person to . . . *excessive* . . . *punishment*." (Emphasis added.) Although a sentence is within

13

statutory limits, it can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So. 2d 762, 767 (La. 1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. *State v. Bonanno*, 384 So. 2d 355, 357 (La. 1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. *State v. Cann*, 471 So. 2d 701, 703 (La. 1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. *State v. Walker*, [20]00-3200, p. 2 (La. 10/12/01), 799 So. 2d 461, 462; *cf. State v. Phillips*, [20]02-0737, p. 1 (La. 11/15/02), 831 So. 2d 905, 906.

*State v. Smith*, 2001-2574, pp. 6-7 (La. 1/14/03), 839 So. 2d 1, 4 (emphasis in original).

"An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La. C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed." *State v. Williams*, 2022-0594, p. 23 (La. App. 4 Cir. 5/8/23), 367 So. 3d 785, 799 (citing *State v. Trepagnier*, 97-2427, p. 11 (La. App. 4 Cir. 9/15/99), 744 So. 2d 181, 189). According to *State v. Major*,

Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with [La. C.Cr.P. art.] 894.1. *State v. Lanclos*, 419 So. 2d 475 (La. 1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).

96-1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So. 2d 813, 819.

Here, the record clearly shows an adequate factual basis for the sentences imposed. The trial court articulated its reasoning for the prescribed sentences by referencing specific factors and applying them to the case at hand. This Court does not find that the trial court abused its discretion.

The trial court found that, pursuant to the sentencing guidelines enumerated in Louisiana Code of Criminal Procedure article 894.1: a lighter sentence would pose an undue risk that the appellant would commit another crime;[1] Mr. Briley needed correctional treatment or a custodial environment;[2] and a lighter sentence would deprecate the seriousness of Defendant's crime.[3]

The trial court then identified various aggravating factors applicable to Defendant: his conduct toward Lamont Fletcher manifested deliberate cruelty in that he shot Mr. Fletcher five times in the fact "for no reason whatsoever other than the fact that he was having a bad day";[4] he knew or should have known the students and Lamont Fletcher were particularly vulnerable or incapable of resistance due to extreme youth or advanced age;[5] he knowingly created a risk of death or great bodily harm to more than one person (there were a total of nine victims);[6] he used threats of violence or actual violence;[7] he used a dangerous weapon in the commission of the offenses;[8] there were multiple victims;[9] he foreseeably endangered human life by discharging a firearm during the commission of the offenses which have, as an element, the use, attempted use, or threatened use of physical force against the person;[10] the offender used a firearm while committing or attempting to commit the offenses;[11] and the appellant had

---

[1] La. C.Cr.P. art. 894.1(A)(1).
[2] *Id.* at § (A)(2).
[3] *Id.* at § (A)(3).
[4] *Id.* at § (B)(1).
[5] *Id.* at § (B)(2).
[6] *Id.* at § (B)(5).
[7] *Id.* at § (B)(6).
[8] *Id.* at § (B)(10).
[9] *Id.* at § (B)(11).
[10] *Id.* at § (B)(18).
[11] *Id.* at § (B)(19).

received five periods of probated or paroled sentences and had been violated each time.[12]

As for general aggravating factors, the trial court found that the Defendant had not expressed remorse throughout the trial and during presentencing hearings. The trial court also reiterated Defendant's history of/ongoing cases for domestic abuse and quoted Lamont Hill, son of Lamont Fletcher, who said that Defendant is "a dangerous person to society."

However, Defendant asserts that the court supposedly ignored factors such as Defendant's mental health issues (anxiety disorder, insomnia, chronic PTSD, and other depressive episodes) and his prior drug problem with synthetic marijuana. By his account, Defendant began a "downward spiral" in 2015 due to an abusive relationship, which caused him to lose his academic scholarship. Additionally, he was the victim of a drive-by shooting and was shot in the leg, which causes PTSD and mood regulation issues. On the morning of the incidents, Defendant purports to have ingested a large amount of synthetic marijuana, Xanax, and another substance he could not recall.

However, the trial court explained that the records it received did not indicate any history with addiction or mental health issues. The trial court was specifically aware of these mitigating factors, yet based on the information it had, it considered those factors irrelevant. The trial court did not abuse its discretion by failing to consider information that it did not have.

Defendant also believes the court should have considered a self-reflection letter he wrote from prison, in which he expressed remorse for his actions, as a mitigating factor. In this letter, he stated "[t]here isn't a single time I have thought

---

[12] *Id.* at § (B)(21).

about the events that have transpired and not wish that the incident have not happened at all." [sic]. Moreover, he expressed "I have done a terrible disservice to my people, my family, and every other being who were affected by this incident. I can only hope to get the chance to contribute back in a positive way to my community." [sic]. He explained that he was happy to hear that Mr. Fletcher recovered because that means a life was not lost and that he could have a "chance to rehabilitate himself for the sake of a better tomorrow." Further, Defendant points to his completion of 20 hours of Peer Support Lead Groups through MHSD inside the Orleans Prison, which supports individuals with anger management and trauma to develop positive thinking.[13]

The trial court in its reasoning explicitly stated that Defendant seemed to show no remorse at any of the proceedings pertaining to this case. At the sentencing hearing, the State noted for the record that seven deputies were present because of Defendant's dangerousness: Defendant had been arrested three times since the imposition of the charges in this case and had "caused issues" while in jail three times. Thus, despite Defendant's letter, his repeated dangerous actions did not suggest genuine remorse for the incidents of May 13, 2021 or that he has responded affirmatively to rehabilitation for anger management and trauma.

Defendant highlights the mitigating factor that a long sentence would burden his family, who depends on him for financial support.[14] It is inevitable that an incarcerated person's family will experience hardship due to his absence. However, Defendant has already received ten years less than the maximum possible sentence for shooting Lamont Fletcher, which was a particularly severe

---

[13] *Id.* at § (B)(30).
[14] *Id.* at § (B)(31).

and egregious commission of attempted second-degree murder. The potential hardship to his family does not show that the trial court abused its discretion in not issuing a lesser sentence.

For the attempted second-degree murder conviction, Defendant's sentence was ten years shy of the maximum possible sentence, fifty years. A jury found beyond a reasonable doubt that Defendant approached Lamont Fletcher, a sleeping homeless man, and shot him in the head five times without provocation. Given the severity of this offense, a sentence of ten years less than the possible maximum is not grossly disproportionate, nor does it suggest needless infliction of pain and suffering upon the Defendant.

As for the convictions for which Defendant received the maximum possible sentence, this Court cannot set these sentences aside for excessiveness because the record supports the sentences imposed. Defendant's commission of the crimes themselves coupled with the litany of aggravating factors show that the sentences are not grossly disproportionate to the severity of the offenses.

## CONCLUSION

At trial, the State presented sufficient evidence for a jury to convict Defendant beyond a reasonable doubt of attempted second-degree murder, possession of a firearm by a convicted felon, possession of a firearm by a person convicted of domestic abuse battery, aggravated assault with a firearm, possession of a firearm in a firearm-free zone, and illegal discharge of a firearm while in commission of a crime of violence. Further, the trial court's sentences were not unconstitutionally excessive. Therefore, we affirm Defendant's convictions and sentences.